IOWA-ILLINOIS GAS & ELECTRIC COMPANY, a corporation, plaintiff-appellant, v. CITY OF FORT DODGE et al., constituting the City Council, defendants-appellees and cross-appellants.

No. 49239.

(Reported in 85 N.W.2d 28)

1204

1206

Sᴇᴘᴛᴇᴍʙᴇʀ 17, 1957.

B. B. Burnquist, of Burnquist, Helsell & Burnquist, of Fort Dodge, and David M. Elderkin, of Barnes, Wadsworth, Elderkin, Locher & Pirnie, of Cedar Rapids, for plaintiff-appellant.

Donald J. Mitchell, City Attorney, and Dwight G. Rider, of Rider, Bastian & Beisser, both of Fort Dodge, and William A. Roberts, of Roberts & McInnis, of Washington, D. C., for defendants-appellees and cross-appellants.

Lᴀʀsᴏɴ, J.—The plaintiff, Iowa-Illinois Gas & Electric Company, is a utility incorporated under the laws of the state of Illinois. Its operations include (1) the generation, transmission, distribution and sale of electricity, and (2) the distribution and sale of natural gas. In connection with these operations it sells and services electric and gas appliances.

The company's Iowa territory is divided into five districts: Davenport, Iowa City, Fort Dodge, Cedar Rapids and Ottumwa.

In the Fort Dodge District gas is distributed only in the municipalities of Fort Dodge and Manson and in the suburban area adjoining Fort Dodge. Reference is sometimes made to a metropolitan area which is a combination of Fort Dodge and adjacent rural area. A rather extensive statement of facts seems necessary for a clear understanding of the problems and issues involved.

The principal service area in the Fort Dodge District is the City of Fort Dodge, in which gas has been supplied by the company or its predecessors since 1882. Within the city the company was serving as of December 31, 1954, 7429 residential customers (6072 used gas for heating in addition to cooking and water heating), 156 commercial customers, 620 commercial heating customers and five industrial customers. These are what are known as firm customers, the company being bound to furnish their requirements with the rates therefor being set by the rate ordinances of the City of Fort Dodge.

The company purchases its natural gas from Northern Natural Gas Company under a rate schedule approved by the Federal Power Commission. Being bound to furnish all of the requirements of the foregoing firm customers, the company contracts for the maximum daily quantity needed to supply the requirements of the firm gas customers and that quantity is based on the estimated requirements of the firm customers to be served during the next heating season on a day having an average temperature of 15 degrees below zero, plus the quantity required for normal growth in number of customers to be served. This volume is known as a "contract" demand for which the company pays a demand "charge", or minimum price, paid to Northern Natural Gas Company irrespective of the volume purchased. In other words, it is a price paid to Northern Natural Gas Company as a guarantee or assurance that this volume will be available. In addition, what is known as a "commodity" charge is paid for the volume of gas actually purchased. Northern Natural Gas Company retains the right to curtail deliveries of gas above the contract demand volume, which is known as "overrun" gas. If overrun gas is authorized to be taken by Northern Natural Gas Company it is paid for at a commodity rate. If overrun gas is taken when not authorized by Northern a penalty price is imposed.

The demand requirements for the year 1954-55 heating season were determined and the contract entered into in April 1953.

It is evident that if sales could be made of any of the gas for which a demand price was being paid in any event and which was not needed on any particular day for the use of the firm customer it would be profitable to the company (and would reduce rates to the firm customers by increasing revenues and thus holding down the company's cost) to sell the gas for such amount as could be obtained over and above the actual cost or "commodity" cost of the gas.

Sales were thus made by way of contract to "interruptible customers", generally large volume customers served on a basis that they would have gas only at such time as it was not needed to furnish the requirements of the firm customers. At any time if all of the needs of the firm customers were not met, Northern Natural Gas Company could and would interrupt the service to the "interruptible" customers. A priority system of interruptibles was set up in six steps with Step 1 interrupted first and Step 6 the last to be interrupted. The usual interruptible customer maintains stand-by equipment providing for other fuel and if the cost of interruptible gas exceeds the cost of full-time service by the other fuel or fuels, a customer will, of course, no longer purchase gas.

As of December 31, 1954, the company served three interruptible (industrial) customers in Fort Dodge. In the rural area adjacent to Fort Dodge the company also served 197 residential customers, two commercial customers, 27 commercial heating customers, ten industrial customers on a firm basis, and eight interruptible customers.

The company also uses interruptible gas in its electric generating station in Fort Dodge.

The demand-commodity type of contract under which the plaintiff-company and Northern Natural Gas Company are now operating, under the jurisdiction of the Federal Power Commission, was adopted in December of 1947.

Since the enactment of Ordinance 1026 there have been six rate increases imposed upon plaintiff-company by Northern Nat-

ural Gas Company, and the present rate charged by Northern Natural Gas Company is 79% higher than the rate applicable in October 1950, when Ordinance 1026 went into effect.

The effect of the increases in cost of gas to plaintiff-company was offset somewhat by increased sales of firm gas in the metropolitan area of Fort Dodge and by successive increases in the contract rates with the interruptible customers made each year since 1950.

The company argues it had reached the point where it was serving 82½% of the potential customers in the City of Fort Dodge with space heating, and that the increased cost could no longer be minimized in any way by increased volume. In addition, charges to interruptible customers had been increased 79% over the rates in effect prior to November 1, 1950, and it also appeared that the interruptible rates could no longer be raised by reason of the fact that they had reached the competitive rate of coal, oil and other fuels; that any further raise would result in a loss of interruptible customers, thus increasing the cost to the firm customers.

The company claimed that unless a rate increase was permitted over and above the rates established by Ordinance 1026 for residential, commercial and industrial service in the City of Fort Dodge, it would operate at a loss, and on February 2, 1954, requested an increase in the rates fixed by Ordinance 1026. After extended negotiations any gas rate increase was denied by formal report and resolution of the City Council of Fort Dodge on July 24, 1954.

On August 2, 1954, plaintiff-company filed its petition in this cause seeking a judicial determination of the question whether the rates imposed by Ordinance 1026 of the City of Fort Dodge were confiscatory and deprived the company of a reasonable return on the fair value of the company's property, all in violation of section 9, Article I, of the Constitution of the state of Iowa. A temporary injunction was issued under bond in the sum of $300,000 restraining the City of Fort Dodge from enforcing rate Ordinance 1026 and restraining the city from interfering with a new rate put into effect by the company.

Defendants filed a motion to dissolve this temporary injunction which, after hearing, was overruled by the trial court.

Upon the trial of the case plaintiff-company introduced evidence showing the original cost of its properties. Its witness Mr. S. Lloyd Nemeyer testified that the books and records of plaintiff-company were kept in accordance with the Uniform System of Accounts prescribed for natural gas companies by the Federal Power Commission, and stated that the plaintiff-company's original cost of its Fort Dodge gas properties had been reviewed by the staff of the Federal Power Commission in 1947, and all property added since that date was recorded at its cost of construction.

William L. Patterson, a principal engineer with Black & Veatch, consulting engineers at Kansas City, Missouri, testified as to the cost of reproduction of plaintiff-company's property, and the observed depreciation of the property, and gave his opinion as to the present fair value of plaintiff-company's property used and useful in serving metropolitan Fort Dodge. He and his staff made a detailed appraisal of the present-day cost of constructing the gas properties used and useful in the metropolitan area of Fort Dodge, as of June 30, 1954. The inventory of the gas system was based upon company records verified by field inspection and study. Field inspections were made at some fifty or sixty points in the City of Fort Dodge to verify location, size, kind of pipe, and to permit a physical inspection of the pipe presently in service. The buildings were field inventoried and the quantities checked with construction plans and company records. A complete listing of names, installations and retirements was taken from company records noting size, kind, location and length of each installation or retirement of main. This information was verified in the field by physical inspection, record maps and working papers of the appraisal of the Fort Dodge gas system made by this same company, Black & Veatch, in 1939. Services were inventoried in the same manner as mains. Meters were inventoried from history cards and all larger meter installations were visited and the pipe and fittings in the meter setting were inventoried. Distribution measuring and regulating equipment was all field inventoried and was checked against company records. General plant property was inventoried from company records and spot verified by field inspection. The inventory

was priced at levels existing December 31, 1953, and the reproduction cost was based upon an assumption that the system would be built by a general contractor as one continuous operation and that the work would be completed within a year's construction period, the general contractor to have full responsibility for the purchase of all materials except pipe for mains, meters and general equipment which are assumed to be purchased by the company and installed by the contractor. Labor rates used were those secured from lists of contractors' organizations as applied to the Fort Dodge area and were verified by rates paid December 31, 1953, by a local Fort Dodge contractor. Labor performances were based upon the experience of the Black & Veatch organization. Material prices used for major items such as pipe were based on actual quotations for material delivered in Fort Dodge, taking into account quantity purchases and discounts. Land in use was included in the appraisal at original cost, except central office land, which was included at a recent appraised value.

Mr. Patterson's complete and detailed finding was introduced as Exhibit 24-P27.

Mr. Patterson by allocation methods based upon his experience, judgment, and upon their commonly accepted usage in other rate matters, determined the reproduction cost of plaintiff-company's property in the metropolitan area of Fort Dodge to be $2,883,002. His observed depreciation of the property was based at $601,966, making a reproduction figure less observed depreciation of the plaintiff-company's property used and useful in serving the metropolitan area of Fort Dodge in the amount of $2,281,036. The original cost of the same property depreciated, as testified to by Mr. Nemeyer, was in the amount of $1,357,315, and Mr. Patterson testified that in his opinion and judgment the fair value of the company's property in the metropolitan area of Fort Dodge was in the sum of $2,023,000.

After testifying to revenues, cost, expenses and income-tax liability, the witness Nemeyer testified that during the calendar year 1954 the company had lost $73,089 in its operation.

Patterson was the only witness to testify as to the reproduction cost of the property and the observed depreciation of the property.

Differences arose over proper allocation of the property, revenues, expenses, as between the different districts of the company and the Fort Dodge metropolitan district and as between the gas and electric operations. Other questions such as the proper method of determining the rate base, the rate of return, income-tax treatment, depreciation, depreciation expense allowance and other expense allowances and allocations were presented. The court adopted most of the city's allocation methods stating "the expenses against the firm load have been shaken down and everything questionable shaken out." It found, however, that even adopting allocation methods most favorable to the city, the firm revenue deficiency of plaintiff-company for the test year 1954 was $20,400. On those findings the court held that the ordinance rates imposed by Ordinance 1026 were confiscatory of plaintiff's property and were unconstitutional, and entered a decree enjoining enforcement of Ordinance 1026. The court retained jurisdiction of the parties and the subject matter and on November 28–30 and on December 1–2, 1955, hearing was had on the question of the excessiveness of the rates that plaintiff-company had put into effect under the injunction bond and as to the amount of refund plaintiff-company should make, if any.

The trial court found that during the fourteen-month period, ended October 31, 1955, the plaintiff-company had collected revenues in excess of what the court determined to be sufficient to pay operating expenses and depreciation and provide an acceptable return upon the fair value of plaintiff-company's property serving the City of Fort Dodge after allowance for costs, depreciation expense and taxes. The fair value of appellant-company's property, which the trial court used in determining the fair return, was based upon its finding in its August 20, 1955, order as adjusted to be applicable to the refund period. That determination was made in the following manner:

| | |
|---|---|
| The reproduction cost new of the property serving firm customers at June 30, 1954, has been found to be | $2,441,267 |
| From this the court deducted its own computed amount of accrued depreciation (24.19%) of | 590,542 |
| The reproduction cost depreciated of the property serving firm customers at June 30, 1954, was determined to be | $1,850,725 |

The trial court found the original cost of the same property as of June 30, 1954, to be — $1,332,366

From which it deducted its own computed amount of accrued depreciation (24.19%) of — 322,299

The original cost less depreciation of the property serving firm customers was found to be — $1,010,067

The trial court then found the fair value of this property at June 30, 1954, to be — $1,442,000

(which is a weighting of 51.4% to its finding of reproduction cost less depreciation and 48.6% to its finding of original cost less depreciation).

In determining the fair value of this property applicable to the refund period, the trial court allowed the net additions which had been made to the property during the refund period of — 73,882

And it included an allowance for working capital requirements of — 71,810

The fair value of the property serving firm customers including an allowance for working capital has been determined to be — $1,587,692

The court found the fair return upon this determination of fair value for the refund period at *annual* rate of 6% for 14 months to be — $ 111,139

The trial court then determined that during the refund period appellant had collected under bond from firm customers excess revenues of $128,154, which amount it ordered appellant to refund to firm customers. That determination was made in the following manner:

Revenues collected from sales to firm customers during the refund period amounted to — $1,530,244

Deducting:

Costs applicable to those sales of — $1,166,085

Depreciation expense computed on the original cost of property of — 36,595

Allowed return on the fair value of the property as found by the court of — $111,139

Plus the court's determination of the corresponding income-tax liability of — 88,271 — 199,410

The total of these costs, depreciation expense and allowed return and income taxes thereon is $1,402,090

Excess collections during the refund period were determined to be $ 128,154

The court then entered an order directing and ordering appellant-company to make refunds of the amount of $128,154, and from this order appellant-company has appealed.

The following propositions are relied upon by appellant:

1. In computing the amount of refunds, the trial court erred in applying to the property its own arbitrary accrued depreciation percentage (24.19%) instead of the observed depreciation percentage (21.4%) supported in the record by expert testimony.

2. In computing the amount of refunds, the trial court erred in giving too much weight to original cost and too little weight to reproduction cost in arriving at its determination of the fair value of the company's property.

3. The trial court erred in its computation of refunds by basing depreciation expense upon the basis of the original cost of the property rather than on fair value.

4. The trial court erred in its computation of the cost of gas to firm customers by treating sales of boiler fuel gas to the electric department on the same basis as an interruptible customer.

Appellees'-cross-appellants' numerous propositions relied upon, which we have condensed, are:

1. The trial court erred in refusing to take into consideration *only* evidence of original costs in considering what was a just and reasonable rate base, for the reason that only speculative opinion testimony of reproduction costs was introduced by the company.

2. The trial court erred in failing to accept or consider the city's evidence of current costs of a similar gas plant of Cedar Falls, Iowa, of accrued depreciation of the property used in service of firm gas customers of Fort Dodge, and as to proper allocation of income taxes to said customers.

3. The trial court erred in failing to consider large refunds from its supplier as income in 1954, though refunds were for prior year overcharges, and that the trial court used an improper test period in its consideration of the alleged confiscation of appellant's property.

4. The trial court erred in allocations of expenses between city firm and other customers of the company, and in finding the calculated deficiency in fair return during the test period of $20,400 constituted confiscation.

5. The trial court erred in requiring that the rates fixed by the city ordinance incident to the vacation of the injunction order conform to the court's findings, and erred in its determination of the amount of the refund of excessive amounts collected from city firm gas users during the injunctive period.

6. The trial court erred in granting the ex parte injunction against the city, without proof of exhaustion of administrative remedy before the council, and in refusing to remand the proceeding to the council to determine initially the rate base and elements affecting the return.

In brief, the appellees contend it is the function of the city to determine by its own method the fair and reasonable return required during the test period, and its findings of fact as to elements considered are binding and must be accepted by the court, which failed to accept this theory of rate fixing in Iowa; also that the consideration and weight given the evidence by the trial court and its resultant computation are wrong and do not disclose such a deficiency below a fair and reasonable rate as amounts to confiscation of the company's property. While not listed in that order, we will consider these many contentions in what we believe to be suitable divisions.

I. The Constitution of Iowa, like other American state constitutions, effects a complete separation of legislative, executive and judicial powers. It has been so many times recognized and declared that regulation of public utility rates is a legislative function, that this court will not dwell upon the matter in this opinion. See Pell v. Marshalltown, 241 Iowa 106, 40 N.W.2d 53; Hirsch v. Muscatine, 233 Iowa 590, 594, 10 N.W.2d 71, 73; Cedar Rapids Water Co. v. Cedar Rapids, 118 Iowa 234,

259, 91 N.W. 1081, 1090; 37 Am. Jur., Municipal Corporations, sections 184 and 185. It should suffice to mention at this time that while the legislative body may create a public utilities commission and delegate legislative powers to it, subject to standards to be provided by the legislature, and may likewise delegate such legislative powers to municipal corporations, such delegation cannot be made to the courts even by express legislative enactment. United States v. Morgan (1938), 307 U. S. 183, 59 S. Ct. 795, 83 L. Ed. 1211; Black on Constitutional Law, Fourth Ed., section 169; 16 C. J. S., Constitutional Law, section 104, page 483; Interstate Commerce Comm. v. Union P. R. Co., 222 U. S. 541, 547, 32 S. Ct. 108, 56 L. Ed. 308, 311; Muskrat v. United States, 219 U. S. 346, 31 S. Ct. 250, 55 L. Ed. 246.

Plaintiff's petition stated that defendants imposed "upon this plaintiff the unfair, inequitable, confiscatory, and noncompensatory rate" under the existing Ordinance 1026 which the city refused to modify and amend. Plaintiff further alleged the defendants' refusal was illegal in that "defendants have deprived, are continuing to deprive, and will deprive the plaintiff of its property without due process of law and without just compensation, all as prohibited by and in violation of section 9, Article I, of the Constitution of the state of Iowa", thus clearly raising a constitutional issue.

The restriction upon the rate-fixing power of the municipality so granted by the legislature is that the rates established by the municipal council shall be reasonable and not confiscatory. Within this restriction the power of the council as so delegated is legislative and not within the court's control. Pell v. Marshalltown, supra, and cases cited therein. It is noted that the method by which the council derives its results is not provided for by statute. We said in the Pell case at page 111 of 241 Iowa:

"As a general rule, the acts of a municipal corporation which are within its power are not subject to judicial review unless there is a manifest and palpable abuse of power, and it is well established that the motives of the council acting in its legislative capacity cannot be inquired into. 62 C. J. S., Municipal Corporations, section 199, page 372; id., section 200, page 376."

It is true that in exercising a power expressly authorized by statute, the council has a discretion, and so far as it *does not act oppressively or unreasonably under that power,* courts are powerless to interfere with that discretion. Swan v. Indianola, 142 Iowa 731, 739, 121 N.W. 547.

However, the appellee city seems to contend that the city council also has fact-finding powers which are binding upon the courts and that its determination of factors involved in the reasonableness of the rates is legislative in nature and cannot be reviewed by the court. Reliance is placed on the cases from states which have utility commissions whose procedure and determination are statutory. They are of little aid to us in this jurisdiction. No council hearings or findings are provided by statute in Iowa. When the complaint is made to the courts that the rates arrived at by the council are confiscatory or unreasonable, there is then evolved a mixed question of fact and law to be decided by the court upon competent evidence produced before it. Pell v. Marshalltown, supra; San Diego Water Co. v. San Diego, 118 Cal. 556, 564, 50 P. 633, 635, 38 L. R. A. 460, 62 Am. St. Rep. 261. Thus it is said the function of the courts is to ascertain whether the power delegated to the city has been carried beyond the constitutional limits so fixed; and if such be found to be the case, to declare the acts of the council void. The Iowa courts do not sit as appellate tribunals to review the methods used in council determination, nor need they know anything about the evidence on which that body has acted.

It is true, however, that before a temporary injunction is granted, there must be a sufficient showing that the company was reasonably co-operative in furnishing information properly needed for council consideration of the relief requested. From the record we learn a period of several months elapsed, numerous communications were exchanged, and reasonable information was furnished by the company. After council discretion was exercised, we are satisfied the trial court did not err in granting the temporary injunction under the allegations of plaintiff's petition. The power of issuing injunctions to prevent irreparable injury has long been an undoubted right of equity courts, of which they cannot be deprived under the con-

stitution except in cases where a substitute remedy is provided that gives the same measure of relief. Peoples Gas Light & Coke Co. v. Slattery, 373 Ill. 31, 42, 25 N.E.2d 482, and cases cited therein. No such other adequate remedy here appears. Also see Prendergast v. New York Tel. Co., 262 U. S. 43, 43 S. Ct. 466, 67 L. Ed. 853; and Smith v. Illinois Bell Tel. Co., 270 U. S. 587, 46 S. Ct. 408, 70 L. Ed. 747. Nor was the court in error in failing to return the rate question to the council once it was before the court. Clearly the court could do nothing to compel further or different legislative acts or control the council's discretion. Thus it becomes clear that we are not confronted with the usual judicial review of the independent judgment of the rate-making body in making findings of fact as required under the terms of the usual state utility commission rate statute. Iowa has no such administrative machinery and its statutes provide no review procedure. The issue before the court was whether or not the rates fixed by Ordinance 1026 were or were not unreasonable and confiscatory. Upon material and competent evidence presented by the parties in the trial the court must base its decision.

II. What, then, is the material and competent evidence the courts of Iowa should receive to determine the mixed question of fact and law as to whether or not the rates, legislatively established, are confiscatory? Must it tend to establish fair present value?

Plaintiff contends evidence of reproduction costs is not only admissible but under present conditions should receive the greatest weight in determining fair value of the company's property used in the production of the public service.

Defendants relied on the "end result" theory as announced by the United States Supreme Court case of Federal Power Comm. v. Hope Natural Gas Co., 320 U. S. 591, 64 S. Ct. 281, 88 L. Ed. 333. It relied on evidence of original costs and rejected entirely any reliance on reproduction costs as evidence of fair value.

The city argues in effect that the rule of Smyth v. Ames, 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819, in which the United States Supreme Court laid down the fair-value rule, and upon which the Iowa cases are based, was overruled by the case of

Federal Power Comm. v. Hope Natural Gas Co., supra, and therefore the precedent for the fair present value rate base has been in some way destroyed in the state of Iowa.

The Hope case was a proceeding to review an order of the Federal Power Commission made under authority of the Natural Gas Act of 1938, 15 U. S. C. A., sections 717(c) and (d). In construing this statute the court, with dissents by Justices Reed, Frankfurter and Jackson, held that Federal Due Process did not require federal commissions to adopt any particular formula in rate making. It ruled that under the statutory standard of "just and reasonable" as used in the Natural Gas Act "it is the result reached not the method employed which is controlling" and "he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." 320 U. S., at page 602, 64 S. Ct., pages 287, 288.

As we understand the latest United States Supreme Court determinations on this question, that court simply holds the Federal Constitution does not require that any specific method be used in determining the question of a fair return in public utilities cases.

The opinion of Justice Douglas in the Hope case, though in several places indicating that the power commission was not in error if it failed to establish a rate base prior to fixing a rate, recognized that the usual and the normal mathematical calculations indispensable to regulating utilities require that there be at some time a recognition of the value of the property so as to avoid confiscation. In his opinion in the Hope case, 320 U. S. 591, at page 603, 64 S. Ct. 281, at page 288, Justice Douglas writes:

"The rate-making process under the Act, i.e., the fixing of 'just and reasonable' rates, involves a balancing of the investor and the consumer interests. Thus we stated in the Natural Gas Pipeline Co. case that 'regulation does not insure that the business shall produce net revenues.' 315 U. S. p. 590, 62 S. Ct. 745, 86 L. Ed. 1052. But such considerations aside, the investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. From the investor

or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. Cf. Chicago & Grand Trunk Ry. Co. v. Wellman, 143 U. S. 339, 345, 346, 12 S. Ct. 400, 402, 36 L. Ed. 176, 179, 180. By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. See Missouri ex rel. Southwestern Bell Tel. Co. v. Public Service Commission, 262 U. S. 276, 291, 43 S. Ct. 544, 67 L. Ed. 981, 986, 31 A. L. R. 807. The conditions under which more or less might be allowed are not important here. Nor is it important to this case to determine the various permissible ways in which any rate base on which the return is computed might be arrived at. For we are of the view that the end result in this case cannot be condemned under the Act as unjust and unreasonable from the investor or company viewpoint."

However, on page 605 of 320 U. S., on page 289 of 64 S. Ct., in the same case Justice Douglas wrote this paragraph: "Rates which enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed certainly cannot be condemned as invalid, even though they might produce only a *meager return* on the so-called 'fair value' rate base." (Emphasis supplied.) We cannot follow such reasoning.

The year following the Hope case, in the decision of the Colorado Interstate Gas Co. v. Federal Power Comm., 324 U. S. 581, 65 S. Ct. 829, 89 L. Ed. 1206 (commonly referred to as the Canadian River Gas Company case), an opinion also written by Justice Douglas, the majority of the court stated on pages 601 and 602 of 324 U. S., page 839 of 65 S. Ct.:

"We do not say that the Commission lacks the authority to depart from the rate-base method. We only hold that the Commission is not precluded from using it. There are ample indications throughout the Act to support that view. Section 6(a) [15 U. S. C. A. §717e(a), 4 F. C. A., Title 15, §717e(a)] empowers the Commission to investigate and ascertain the 'actual

legitimate cost of the property of every natural-gas company, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation *and the fair value of such property.'* As we have noted, §9(a) gives the Commission authority not only to require natural gas companies to carry proper and adequate depreciation and amortization accounts but also to fix such rates for 'the several classes of property of each natural-gas company used or useful in the production, transportation, or sale of natural gas.' * * * These provisions all suggest that when *Congress designed this Act* it was thinking in terms of the ingredients of a *rate base,* the deductions which might be made, and the additions which were contemplated. No exclusion of property used or useful in production of natural gas was made. That type of property was not singled out for special treatment; it was treated the same as all other property. We must read §1(b) in the context of the whole Act. *It must be reconciled with the explicit provisions which describe the normal conventions of rate making."* (Emphasis supplied.)

The foregoing indicates that while, if certain portions of the Hope case are considered independently of their context and the decision as a whole, it might tend to support the contention that the decision is authority to ignore fair value and "the normal conventions of rate making", the fact is, when the Hope case is fully considered together with the statutes with which it dealt, and viewed from the mature consideration of consequences observed and mentioned in the Canadian River Gas Company case, even the Hope case cannot be taken to be an authority that the finding of a rate base and "conventions of rate making" should be omitted in any public utility rate-regulating proceeding. The sum total of this Hope decision is thus seen to have been often misunderstood, distorted and exaggerated by those who used it as an authority for the proposition that formerly-established normal conventions of rate making are now obsolete and that a rate base need not be determined in a public utility rate-making procedure. Indeed, this court does not perceive how any calculations of depreciation, legitimate financial expenses or indeed other calculations indispensable to

regulating the rates of a public utility company without violating its rights under the due process clause can proceed without giving consideration to the somewhat baffling, but nevertheless unavoidable, problems attendant upon ascertaining a rate base reflecting, to avoid confiscation, the fair present value of the property.

This is certainly indispensable to the obligations of the court recognized in the Hope decision, to give the equity owner a return "commensurate with returns on investments in other enterprises having corresponding risks", and to insure a return which will "be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." 320 U. S. 591, at page 603, 64 S. Ct. 281, at page 288.

The Hope case was decided in the year 1943 upon facts arising in the year 1939, near the end of a twenty-year period of level or declining prices and construction costs. At that time, therefore, rates established upon original cost, prudent investment, reproduction cost or any other base, might have been the equivalent of rates based on present fair value as far as the "end result" is concerned. Almost another sixteen years had passed by the time the trial court had entered its decision in the instant case and that twenty years saw an almost unbroken spiral of price inflation. Not endowed with psychic powers, the writer of the majority opinion in the Hope case could not have been expected to, nor had he any occasion to, predict the erosion of the value of the dollar which was to come in the later period.

Many courts since have expressed opinions on the meaning of the Hope case.

"Our impression of the Hope case is that in the main its discussion of judicial review is a statement of the substantial evidence rule." Railroad Commission v. Houston Natural Gas Corp., 289 S.W.2d 559, 569.

"The Hope case is not binding upon the Public Service Commission of Montana. Its action must square with the Montana statutes and the decisions of this court." Montana ex rel. Olsen v. Public Service Comm. (March 19, 1957), 308 P.2d 633, 637; also see 309 P.2d 1035.

"The Commission now urges this court to depart from its established holdings in public utility rate cases on the basis of the decision of the United States Supreme Court in the case of Federal Power Comm. v. Hope Natural Gas Co. * * * The Hope case, however, is not a precedent for the formulas adopted by the Commission in this case." Illinois Bell Tel. Co. v. Illinois Commerce Comm., 414 Ill. 275, 287, 111 N.E.2d 329, 335, 336.

█ The Supreme Court of this state must determine the constitutional requirements in Iowa, and is not under any obligation to uphold a state statute merely because in the view of the Supreme Court of the United States it is not unconstitutional. McCollum v. McConaughy, 141 Iowa 172, 119 N.W. 539.

As a matter of fact the reverse is true, and the holding of the Supreme Court of Iowa as to the Constitution of the State of Iowa and the constitutionality of statutes is binding upon the federal courts. Fischer v. Excess Ins. Co. of America, 115 F.2d 755; C. B. Nash Co. v. Council Bluffs, 174 F. 182; Hagerla v. Mississippi River Power Co., 202 F. 776; McCain v. Des Moines, 84 F. 726; Iowa Telephone Co. v. Keokuk, 226 F. 82.

The decision in the Hope case then clearly does not go to the extent appellees claim. In fact, the opinion itself stated:

"This order is under judicial review not because we interpose constitutional theories between a State and the business it seeks to regulate, but because Congress put upon the federal courts a duty toward administration of a new federal regulatory Act." 320 U. S. 591, 645, 64 S. Ct. 281, 308.

We conclude the most that can be attributed to the Hope case is that the United States Constitution does not require any specific method of determining a fair rate base and that any reasonable method may be used, including original cost and reconstruction costs, if the end result does not disclose an unfair or confiscatory rate.

█ Precedent for a fair value rate base in Iowa is found clearly and specifically in Cedar Rapids Gas Light Co. v. Cedar Rapids, 144 Iowa 426, 120 N.W. 966, 138 Am. St. Rep. 299, 48 L. R. A., N. S., 1025; Id., 223 U. S. 655, 32 S. Ct. 389, 56 L. Ed. 594. The city urges upon the court authorities from other jurisdictions and particularly from the decisions of federal commis-

sions, stating them to be "modern judicial pronouncements." It is a question of whether they are more "modern" than other recent cases which hold exactly the opposite. Without doubt the law cannot be said to be static. It grows and changes, but always under the impetus of reason. No court should be concerned with whether it is "modern" but with whether it is right. There are such things as eternal virtues and ultimate truths, particularly in the field of constitutional law. The constitutional guarantees against legislative confiscation and against the taking of private property without due process should and do mean the same in the year 1957 as they meant in the year 1909:

" 'The right of property rests, not upon philosophical or scientific speculations, nor upon the commendable impulses of benevolence or charity, nor yet upon the dictates of natural justice. The right has its foundation in the law.' * * *

" 'In a government like ours theories of public good or necessity are often so plausible or sound as to command popular approval, but courts are not permitted to forget that the law is the only chart by which the ship of state is to be guided.' " Hunter v. Colfax Consol. Coal Co., 175 Iowa 245, 271, 154 N.W. 1037, 1047, 157 N.W. 145, L. R. A. 1917D 15, Ann. Cas. 1917E 803.

While we do not say that the Constitution of the State of Iowa requires the determination of a fair-value rate base, to say that the constitution in the light of modern judicial pronouncements no longer protects property is to forget that property rights are also human rights. Freedom is invaded when property rights are ignored and this is true when the property confiscated is owned by stockholders through a corporation as well as when it is an individual's home, his livestock, or the tools by which he earns his living.

In the determination of a property valuation, possibly any method is susceptible to some attack and criticism.

The arguments against fair value are all ones of expediency, not ones of justice or fundamental fair treatment. It is obvious that fair value introduces certain problems of proof. There must be estimates of reproduction cost, and of course these are by necessity estimates, but they are estimates of the cost of a plant in existence. They are close enough for practical purposes, and

are obviously more likely to be reasonably correct than contractors' estimates of a plant to be built, on which estimates billions of dollars have been and will be spent.

Furthermore, with the complete bookkeeping records now kept, it is not too difficult or expensive to apply trended percentages to original cost and thereby obtain a trended original cost, which will serve as a very accurate guide to the general effects of inflation, over the life of the property—or, as the case may be in some instances, deflation. Since neither original cost nor trended original cost nor reproduction costs are final ends in themselves, but only guides to judgment in arriving at "fair value", precise mathematical figures are not mandatory. The original cost of a piece of real estate or property sixty years old is obviously not a sound basis for judgment of value today, and is obviously far more out of line than any estimate of reproduction cost or of trended original cost. These criteria are also far more definite and clarifying than the vague and indefinite "end result."

The ultimate goal is, of course, just and reasonable rates. This calls for an adequate total return which will enable the company to give good service not only today but tomorrow, and the best service that the standards of living of the community will permit.

The fixing of just and reasonable rates must function in a world of change, and must constantly readapt itself to the effect of those changes. It would, of course, be so much easier to think of dollars as something constant and unchangeable, but that unfortunately is not true and has not been true during the last sixty years, if ever it was. The company must have an adequate total allowance in terms of the present buying power of money because that is the only kind of money that is in use today.

Professional economists have never been able to work out a general theory of economic value which is not susceptible to criticism. The fact that the problem of valuation for rate making is difficult, however, and the answer not generally subject to precise determination, does not make the problem unsolvable. Justice cannot always be answered with certainty and in many

areas of the law, if not most, justice calls for judgment and opinion. Value cannot be arrived at by adding up numbers, but must necessarily be a determination based upon intelligent opinions and facts adduced from the competent, credible record. This is true in most areas of the law.

Appellant argues that stockholders have invested their money in Iowa utilities upon the faith in the announced rule that the return must be based upon the fair value of the property and not upon the cost or any other method, and that anything less than a fair return upon the fair value of the property devoted to public use is confiscation and unconstitutional under the Constitution of the State of Iowa. The trial court determined that fair present value is the basis used in Iowa upon which rates shall be determined, because of "precedent" and "reason." We do not understand the city denies this precedent, but it points out that the court was following the pronounced doctrine of the United States Supreme Court in Smyth v. Ames (1898), supra, 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819, which it claims was reversed in 1944 by pronouncements in Federal Power Comm. v. Hope Natural Gas Co., supra, 320 U. S. 591, 64 S. Ct. 281, 88 L. Ed. 333, since adhered to by the federal courts.

With due respect for the asserted holding of the United States Supreme Court that the Federal Constitution requirement of due process is not violated by a failure of the rate-making body to base its fair rate of return on fair value of the utility property used and useful in rendering the public service, and the persuasion of such a determination on like questions under similar state constitutional provisions, we are convinced that the wording of our Iowa statute conferring rate-making authority over urban utilities upon municipal bodies as heretofore construed by this court has established a fair and reasonable precedent which should not be disturbed in this case. It is conceded by counsel that many states, by statute, still require consideration of fair value by rate-fixing bodies, and we are content to remain one of that group who feel such consideration necessary and proper in order to determine a "reasonable and remunerative" return to the holders of utility property used in public service. It seems that in a state such as ours where no state

utility commission with a highly trained and skilled technical and economic staff is maintained to regulate urban utilities, a fair value rate base is the only fair and just measuring tool by which the court can determine whether or not a rate established is or is not confiscatory. To adopt the appellee city's contention of "end result" in this state would under present conditions result in utter chaos.

As heretofore stated, rate making being a legislative process, no record need be kept of the council's hearings and no findings of fact need be reported. What facts would there then be to review? Courts, of course, must not surrender the power of review to determine the constitutional question of confiscation, and to accept any rate fixed by the council as factually determined without a revaluation of its basis would seem to call for a surrender of the court's function. See Keller v. Potomac Electric Power Co., 261 U. S. 428, 43 S. Ct. 445, 67 L. Ed. 731, 735; Burlington Transp. Co. v. Iowa State Commerce Comm., 230 Iowa 570, 298 N.W. 631; Prentis v. Atlantic Coast Line Co., 211 U. S. 210, 226, 29 S. Ct. 67, 53 L. Ed. 150, 158.

Here, of course, we are not favored by any fact determination except that the council decided no rate increase was required. The view that councils are classed as statutory commissions with administrative functions we decline to accept.

It is difficult enough, as is richly illustrated in the present case, to follow hundreds of pages of testimony of technical experts, and detailed computations of accountants and engineers, when some fairly certain guides and yardsticks are available. It would be impossible without them, which may account for some courts' apparent acts in accepting the findings of their highly trained and efficient utility commissions regardless of manner of determination or of whether or not a fair value was disclosed. Such a finding of fact under their acts may not be a denial of due process, and so unless it otherwise appears that the return is so unjust and unfair as to amount to confiscation, the court will not interfere. Under our present system, with no state utility commission to regulate urban utilities, with delegated powers and authority, we do not accept the "end result" theory in Iowa.

Even then such powers cannot deprive the company of its constitutional rights. Thus we are among those that require a fair return on the fair value of the company's property used and useful in producing the public service at the time of the test.

It must be concluded that Iowa still adheres to the doctrine announced in the Cedar Rapids Gas Light Co. v. Cedar Rapids, supra, 144 Iowa 426, 431, 120 N.W. 966, 968, case where we said: "The power of the municipality to regulate the rates to be charged for gas, save that these may not be so reduced as to deny to the company a fair return upon the property used in the service of the public, is not questioned."

 III. Consideration next must be given the proper factors tending to establish fair present value. Fair value should take into consideration original cost, and also reproduction or reconstruction costs, the factor of current value to reflect the greatly increased costs which have become imbedded in our economy. Perhaps there are other factors to consider, but these factors properly determined must find appreciable reflection in the rate base. Present reproduction cost, less depreciation, has been the most generally accepted method of reflecting major changes in price levels and of giving effect to current costs. Central Maine Power Co. v. Public Utilities Comm. (1954), 150 Maine 257, 109 A.2d 512; Tobacco River Power Co. v. Public Service Comm., 109 Mont. 521, 33 P. U. R., N. S., 151, 98 P.2d 886; McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316; Illinois Bell Tel. Co. v. Illinois Commerce Comm., supra, 414 Ill. 275, 111 N.E.2d 329.

It is not the only method, however, and the use of original cost figures to arrive at fair value can be accomplished by the use of price indices. This method has been growing in use and acceptance both as evidence of present value and as furnishing a comparison with reproduction cost figures. Clark's Ferry Bridge Co. v. Public Service Comm., 291 U. S. 227, 54 S. Ct. 427, 78 L. Ed. 767; McCart v. Indianapolis Water Co., 302 U. S. 419, 58 S. Ct. 324, 82 L. Ed. 336; Los Angeles Gas & Elec. Corp. v. Railroad Commission, 289 U. S. 287, 53 S. Ct. 637, 77 L. Ed. 1180; State v. Tri-State Telephone & Telegraph Co., 204 Minn. 516, 284 N.W. 294; Re Montana Power Co., 1 P. U. R.3d 167.

These factors were considered in the decision of this court in the case of Cedar Rapids Gas Light Co. v. Cedar Rapids, supra, 144 Iowa 426, 431, 439, 120 N.W. 966, 969, which required that the trial court, when testing a rate ordinance challenged on constitutional grounds, make a determination as to whether the ordinance "will operate as a confiscation of plaintiff's property without due process of law." The value, determined from the record in that case, was "largely in excess of its cost, but, according to the record, the value of material as well as the cost of labor has greatly increased since much of the plant was constructed." What was sought to be established was a fair present value rate base for the utility property at the time of the inquiry.

One question, then, is how much weight is to be given to original cost and how much to present-day construction costs, to arrive at a properly-judged figure as to present value. We think that where construction costs have been substantially level for a long period of time, perhaps for a large part of the average life expectancy of a utility property, original cost would merit major consideration. Where fluctuations of price levels are sharp, but seem likely to balance out over a short term, a "50-50" weighting such as that given by the trial court would be completely tenable. However, where construction costs have fallen more or less continuously over a substantial period of time, or have risen more or less continuously over such a period, original cost can be given weight only to the extent that a return to the same level appears reasonably imminent.

It would appear that the level of construction costs which can be expected to prevail in the foreseeable future would be a floor below which the pricing of the present value of a utility property could not go without entering the area of possible confiscation. In this, as in any other constitutional inquiry, the duty of the trial court is to determine the facts from the material and competent evidence before it, and not on its own impulse. We believe that in its approximate "50-50" fair-value determination, unsupported in the record, the trial court was in error.

The only evidence of a "confiscation floor" appearing in the record is in the testimony of the company's witness Patterson.

He gives a number of considerations for a fair-value determination below the cost of reproduction less depreciation. One of these considerations is the fact that construction costs could drop below the levels adopted in determining present-day costs. In this connection he gave consideration to both three-year and five-year recent averages of construction costs. Of course, original cost five years ago was likewise reconstruction cost *at that date,* and the same may be said for related costs in the intervening · years. To such an extent, then, Patterson's fair-value figure gives substantial consideration to original costs in years when, the record shows, a very substantial part of the property was constructed.

Considerable criticism of the methods and basis for Patterson's testimony is found in the briefs and arguments of appellees. Competent evidence on the subject, which would have been much more helpful to the court below and to this court, is wholly lacking. Patterson's fair-value figure appears to result in a weighting of 72% present-day construction cost and 28% original cost.

We are persuaded, by a careful review of the testimony in the record, that the trial court was not realistic in giving approximately a "50-50" weighting to the valuation evidence submitted by the parties on original cost and on reproduction costs. We conclude greater weight on reconstruction value must be given, to the extent hereinafter indicated.

Under such conditions as are evident in the country today, reason as well as respectable authorities sustain that conclusion. These conditions might be the logical basis for a contention that only reproduction costs should be considered. But such a basis alone also has its weaknesses.

In Knoxville v. Knoxville Water Co., 212 U. S. 1, 9, 10, 29 S. Ct. 148, 150, 53 L. Ed. 371, it was said: "The cost of reproduction is one way of ascertaining the present value of a plant like that of a water company. * * * The cost of reproduction is not always a fair measure of the present value of a plant which has been in use for many years."

Deterioration, depreciation, completion under a schedule, and obsolescence are factors not readily apparent. The value testified to of such structures is only one of the factors to which

consideration must need be given in such a proceeding and the reproduction value is liable to be increased from other consideration and diminished by various allowances, above referred.

A big difference between engineers who were figuring on reproduction costs is to be found in the estimated cost of certain materials and labor, especially as to installation estimates. One may take average costs before great increases in prices; another after or at present prices. None of these represented normal conditions, and therefore none was entirely fair or just. That "normal conditions" are hard to define is quite true, but that concept is again a matter of judgment.

It is equally true that the original prudent cost of construction, less depreciation, cannot be held to be the only proper basis for determination of value for rate-making purposes. It is far too rigid and does not lend itself to reflection of any economic change. As a general rule we must consider any value a fair value which fair and reasonable men would say ought to be attached to the property, under all the circumstances of the particular case, for the purpose of measuring a return which the public should pay to the owner.

We have heretofore expressed our views on the general subject of valuation of a public utility for rate-making purposes, and will now apply those views to the special facts in the case at bar.

IV. Specifically, our problem here is to determine, under the evidence submitted, the present fair value of the property used and useful by the company in rendering public service to the firm customers in Fort Dodge during the test or calendar year 1954, and then apply it to the refund period. The test year was fixed by the court as the calendar year of 1954, and we think correctly. It proved to be a year when the cost of gas, which was about 80% of the operating expenses of the company, was not in controversy, and covered a *normal operating year* in every respect. There is no merit in the city's contention that the year beginning June 30, 1953, to June 30, 1954, was preferable or should have been used. Refunds received as overcharges from the supplier for three previous years alone would have destroyed that status if they were considered current income as contended for by defendant city—a wholly unsound position.

If the property was to be installed new; which would be needed to render present services, we would of course value it as of today's prices. But it is not that simple. As indicated, other factors must also be considered. Attempts have been made to develop rules which purport to direct the inquiry unerringly to a precise answer, but actually fair value is nothing more than some average of dissimilar factual valuations of private property. Smyth v. Ames, supra, 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819; Troxel, Economics of Public Utilities (1947) 290, 291. As heretofore pointed out, it is a composite figure we search for, not based on one method alone with its imperfections, but on several. We arrive at the fair value here by a fair consideration of both original cost and reproduction costs depreciated.

 Fair rates should depend somewhat upon what the investors might reasonably have expected from the investment in the enterprise. Troxel, Economics of Public Utilities, supra, 304 et seq. Stockholders, not being considered the same as bondholders but as investors, would not know what to expect of their investments unless or until the value of the property involved is ascertained. This is a real objection to the so-called "end result" test advanced in Federal Power Comm. v. Hope Natural Gas Co., supra, 320 U. S. 591, 64 S. Ct. 281, 88 L. Ed. 333, and weighs heavily in our rejection of it here in Iowa. Some standard certainly is necessary. We are convinced the fair-value doctrine is uncertain enough without turning over to some group of individuals the task of furnishing a new and different yardstick on each occasion a test is required. So like other states, we too, under our present situation, reject as too uncertain the end result test. Legislatures in other states require a more certain measurement by their commissions. Welch, The Rate Base is Here to Stay, 52 Pub. Util. Fort. 635.

The most serious problem in allocating weight to the estimates of the experts, both as to original cost depreciated and reproduction costs depreciated, is due to the period of rising prices experienced throughout the nation since 1939. In a period of fairly constant dollar values (almost unknown to this generation) there is no serious objection to a valuation based on costs, for then replacement costs to a great extent would be the same as original costs. No one knows when we shall again obtain

that period. Thus, as pointed out in Thompson & Smith, Public Utility Economics (1941) 289, the principal objection we have to such valuation is that it tends to make utility rates too rigid.

Presently, the owners of the equity are hurt by original cost, but it can be the ratepayer who feels the pinch in times of declining prices, prices below costs. Present value in that situation would be less than the historical cost.

Consideration of the present price level brings the point home. The last valuation of the company's property was in 1939. From the record we learn The Committee on Valuation of the National Association of Railroad and Utilities Commissioners (1953) Report states that prices have increased over pre-war levels as follows: Consumer prices 89.5%; wholesale prices 108.8%; average hourly earnings 181.8%; and gas plant construction costs 136.7%. Other examples are found in the United States Department of Labor Consumer Index and disclose the food index at 47.1% in 1939, 114.6% in 1952; and for apparel 52.5% in 1939 and 105.8% in 1952. Reports of the Bureau of Labor Statistics, the Federal Reserve Bank of N. Y., and the National Industrial Conference Board indicate that the value of the dollar since 1939 has decreased from 181.8 steadily until 1954 when it was 99.8. In other words, the dollar has lost one half its purchasing power in commodities during that period of time, thus doubling the cost of items needed as replacement for an operating business. It is truly as though we were now using a different currency. Practically all segments of the country's economy are using a reduced unit of exchange. Should utility companies be treated differently? We think not.

There is merit in the company's contention that it is then unfair and unjust to require it to put up its property in terms of the high old unit while receiving the cheap new unit at the counter. If the company has any undepreciated value left in 1882 mains, should it be valued in 1882 dollars? We think not. The remaining life undepreciated must be given a 1954 value. If this were not so, the result would be to practically give the consumers all the benefits of ownership with none of its disadvantages. We are sure that is not the intent of the law. Ostensible gains and losses resulting from price fluctuations

should go with ownership. As pointed out by the able trial court, adherence to original cost alone when the property is in fact privately owned, neither gives the stockholder a realistic income in high times nor the ratepayer a realistic rate in low times. By establishing here and now fair *present* value, we more nearly keep the income and the rate stable in terms of realities. In the future when economic conditions justify a reappraisal, it should be made, upward or downward as the case may be.

Capital structure in such companies includes a portion of risk capital, and risk-takers, the stockholders, justly demand to go forward with the economy. Brymer v. Butler Water Co., 179 Pa. 231, 36 A. 249, 36 L. R. A. 260. The city argument that there is little risk in the captive market held by a utility fails to note the numerous public service companies with captive markets which have been wiped out due to technological changes and changes in the public appetites. Those now gone or going are the street railways, manufactured gas, and even now municipal bus transportation. The turn of the century may see gas as a means of heat entirely eliminated and replaced by atomic electrical power, or the supply may become exhausted or too expensive to purchase for profitable distribution. If things go bad and the utility fails, certainly the ratepayers of Fort Dodge cannot be expected or compelled to dig into their pockets to repay the original investment of the stockholders. The abandoned obsolete gas-producing plant was not a chargeable loss to the consumers.

Rates are controlled and kept reasonably low because of the franchise privilege. It buys no more than reasonable price fixing by the community—not confiscation rights by the municipality.

There is perhaps another objection to value being fixed at original cost alone which we should mention. It is not to the community's advantage to keep such vital necessities as public utility services in a regulatory straight-jacket. State Public Utilities Comm. ex rel. City of Springfield v. Springfield Gas & Elec. Co., 291 Ill. 209, 125 N.E. 891; Public Service Gas Co. v. Board of Public Utility Commrs., 84 N. J. L. 463, 87 A. 651, L. R. A. 1918A 421. New and better equipment will, of course, result in better and more progressive service to the community.

Extensions will aid in the city's growth. But with industrial measuring, regulating and transporting equipment doubled in price, will the management be encouraged to go forward or be content to let obsolete and inefficient equipment continue in operation until it fails or reaches its fully paid-for status? Such service is not likely to be less costly to the customers. Obsolescence and economic changes should be a stockholder's risk, but in a strict application of the original cost theory the customer must shoulder the expense. See Thompson & Smith, Public Utility Economics (1941) 263. Also see Raymond, Engineer's Methods of Inventorying and Valuing Public Utility Properties, 9 Iowa L. Bull. 36; Coffman, The Meaning and Ascertainment of "Value" of Public Utilities, 15 Iowa L. Rev. 401, and a note in 15 Iowa L. Rev. 198. Also see Updegraff, Iowa Rules for Valuation of Public Utility Property in Relation to Rate Making, 40 Iowa L. Rev. 495, 498. The answer to the city's contention that the investors merely venture capital for which a fair return is given is well summed up in Mr. Updegraff's article where he calls attention to the "bargain" once referred to by Justice Holmes. He said:

"The 'bargain' referred to by Mr. Justice Holmes is obvious to the ready perception of any honest and unbiased person. The privately owned public utility has undertaken to serve the public by supplying transportation, gas, electricity, water, or some other utility service on condition that it be allowed to earn a fair return upon the value of the property devoted to the public use. This clearly is not the money expended for such physical property but rather the physical property itself. * * * To say that the property devoted to the public use is the money invested in the physical property is an unrealistic disavowal of the clear intentions of the parties when the agreement was formed by the grant of the franchise and its acceptance. It is an obvious matter of common knowledge that the public utility cannot serve the public with dollars alone. It must invest those dollars in physical operating properties which from time to time must be replaced and repaired. These steps must be taken when necessary on the basis of the then market prices of replacement and repair materials and costs of labor. Unless value for rate-making pur-

poses of the properties devoted to the public use can be kept within some reasonable relationship to the fair value at the time of the steps of rate making, the public utility owner will be deprived of one of the clearly implied terms basic in the transaction."

In other words, the terms of the bargain are that the company will keep up-to-date, efficient service and will receive a return on the value of the property necessarily provided for that purpose. They are not merely getting back the money originally invested plus a fair rate of interest under the terms of this "bargain."

In Consolidated Gas Co. of New York v. Newton, 267 F. 231, 237, 238, Judge Learned Hand expressed well the basis upon which a company is justified in asking a new value determination by council, commission or court. He said:

"It is true that individual misfortunes cannot be foretold, and these a given company must bear, just as any single competitive venture would have to bear them. Among those, however, *is not a general rise in prices,* which, affecting all alike, at least after a time, enables each to raise his price, not only because of his costs in labor and in materials, but to obtain a proportionate increase in his profit, based upon the increased value of his plant and machinery. * * * The risk of the depreciated dollar is not one which industry in general will bear. * * * It must, of course, appear that the variation in prices is not transitory, and the period of probation before a company is allowed relief is precisely to insure against that possibility. The chance of loss during that period such companies must endure, and there is an inevitable 'lag' in readjustments in each direction. *But, once it appears that the new price levels are not transitory, it is no answer to the company's complaint to say that at some future time prices may fall. When that time comes, if it does, the property must again be revalued;* but meanwhile they are entitled to some protection, and since these have become questions for the courts, to the protection of the courts." (Emphasis supplied.)

No one can seriously question this logic, nor can one at this time seriously dispute the facts known to all that the depreciated dollar appears to have no immediate probability of

a return to its old value. With the high government debt and other spiraling costs, new values seem to be well established for some time to come. We conclude, therefore, considerable weight —more weight than the trial court allowed—must be given reproduction costs in arriving at an adjudged fair value of the company's property now used in rendering service to the firm customers of defendant city. Our many recent decisions, especially in damage award cases, disclose that this court is aware of the new dollar value in relation to commodities and services. Turner v. Hansen, 247 Iowa 669, 75 N.W.2d 341; Harms v. Ridgeway, 245 Iowa 810, 64 N.W.2d 286.

This property was last valued in 1939. As pointed out, the constant trend has been toward a new value on everything since that date, and most property as well as services have more than doubled in price. Justly and practically we must recognize this change to a new price level, and until some future date discloses a new one, values fixed as of now must be strongly considered and given much weight. Fair value, of course, is not a single figure at which we can arrive by the application of a certain formula. We must and do fix it here as a judged figure. See Troxel, Economics of Public Utilities (1947) 259; 2 Bonbright, Valuation of Property (1937) 1081–4.

Our conclusion and judged valuation of the company's property used and usable in serving the firm customers of defendant city during the test year of 1954 is $1,528,733, and during the refund period due to improvements and reasonably valued additions of $73,882, a total of $1,602,615. We reach these figures under the conditions shown here, by giving 70% weight to reproduction costs and 30% to original costs.

V. We next turn to the troublesome question of depreciation.

One of the principal differences between the parties in this litigation arises on the matter of depreciation, both accrued and annual. Broadly speaking, depreciation is a loss not restored by current maintenance which is due to all the factors causing the ultimate retirement of the property. These factors embrace wear and tear, decay, and inadequacy. Annual depreciation is the loss which takes place in a year, and it is usually charged to the consumer. In determining reasonable rates

for supplying public service it is proper to include in operating expenses, that is, in the cost of producing the service, an allowance for consumption of capital in order to maintain the integrity of the investment in the services rendered. Lindheimer v. Illinois Bell Tel. Co., 292 U. S. 151, 54 S. Ct. 658, 78 L. Ed., 1182.

In cases such as this before us the rates established by the legislative body are presumed to be reasonable. The company concedes it was its burden throughout the case to sustain its right to a temporary injunction, and later a permanent injunction, upon the grounds that the established rate was unreasonable and confiscatory. This burden must be met by showing the established rate was clearly, palpably and grossly unreasonable, and does not shift. 12 McQuillin Municipal Corp., Third Ed., 493.

We have tried to understand the testimony offered by the company to substantiate the 21% accrued depreciation claimed via observed condition of the property. We fail to find therein adequate consideration for elapsed estimated life of the property upon which yearly depreciation was or should have been taken. In other words, no present property value should be given property fully depreciated though still in use and usable at this time. For rate-making purposes perhaps something more concrete is needed to determine expired life than mere observation, for usually the property has previously been depreciated on an estimated life. Mr. Patterson's estimate was made from inspections, from "looking at the pipe as it is now in the ground, making complete notes as to the condition of the metal, the pits that might be in the steel pipe, the softening or carbonization that might be in the cast-iron pipe, or any other items, such as coating, or vestiges of wrappings, or galvanization which might show." We can understand how from this observation an estimate may well be made as to *remaining life,* and how a rather accurate value may be assessed to that remaining life under today's prices, but we do not see how it would reflect the loss of life previously charged to the entire property. Surely, then, resort had to be made to installation dates and life expectancy from the company's records. Further chances of error would thus appear, and we confess we were

quite unable to follow clearly the experts' computations so as to properly reflect accrued loss throughout the plant in the past. An estimate of remaining value may or may not reflect remaining life. In other words, half its life may now be worth its original cost. Yet it has been substantially depreciated during its expired life.

The city's expert, C. M. Stanley, testified as to loss of life on the "straight-line" method of depreciation set up by the company upon its installation. This method utilized property service life established as a basis of depreciation charges. It was originally established by appellant-company based on years of observation and knowledge of use. Appellees computed accrued depreciation by taking an estimated remaining service life study of the property in service based on the original cost of the property applied to the probable life factors of the classes of property involved. Mr. Stanley stated:

"We did the same type of analysis on both the distribution plant and the general plant to determine the amount of accrued depreciation or the amount of reserve that would have resulted had those annual rates been assessed against that property over the life thereof and also examined from a service life basis utilizing the probable service life and survivor type curves on it. * * * The figure of 71.25% on the second page of Exhibit D-237 under column 3 is the per cent of remaining service life and is obtained by dividing the figure in column 3, line 32, of $1,112,974 by the figure also in line 32, column 1, of the value of property in the metropolitan area to which this study was applied; in other words, it is the ratio. It means that 71.25% of the property, of the cost of the property, was found by our studies to represent the remaining service life of that property."

Later he adjusted his figure to 27.5% expired life, and we are inclined to believe this figure more closely evaluates the past life or accrued depreciation of the system than the 21% contended for by the company.

The problem was considered by the Illinois and United States Supreme Courts in Lindheimer v. Illinois Bell Tel. Co., supra, 292 U. S. 151, 167, 168, 54 S. Ct. 658, 665, 78 L. Ed. 1182, 1193, where it was said: "The Company has used the 'straight-line' method of computation, a method approved by the Inter-

state Commerce Commission. * * * By this method the annual depreciation charge is obtained by dividing the estimated service value by the number of years of estimated service life. The method is designed to spread evenly over the service life of the property the loss which is realized when the property is ultimately retired from service. According to the principle of this accounting practice, the loss is computed upon the actual cost of the property as entered upon the books, less the expected salvage, and the amount charged each year is one year's pro rata share of the total amount."

This method appears to have been the company's own past method of depreciating its property, and it should not now complain as to its propriety.

It was said by the Wyoming Public Service Commission in Re Montana-Dakota Utilities Co. (1956), 16 P. U. R.3d 130, 136:

"Depreciation is the loss of capital assets which a utility annually sustains due to all of the various factors contributing to and causing the ultimate retirement of its plant facilities. We have heretofore characterized depreciation as 'a hole in the utility's assets.' It represents the reduction in the service or economic life of its properties, i.e., the extent of the impairment of its capital investment or *the amount of the consumption of its capital assets* over any fixed service period. If the company has properly accrued depreciation on its natural gas properties on a company-wide basis, as it says it has, the amount of its overall depreciation reserve should at any given time accurately represent the actual depreciation of the properties then existing, i.e., the amount of its capital assets consumed in its natural gas business." (Emphasis supplied.)

We are further confused in the case before us by the company's contention that it did not provide for adequate reserves in the past, but has accumulated only some 13% on its books. From the reserve it took out some $100,000 for an obsolete and unused gas plant. Thus we are unable to consider the company's depreciation reserve as an aid to discover expired or depreciated life with any accuracy, and feel justified in rejecting the company's figure for accrued depreciation and accept the city's straight-line computation of 27.5%. We will apply that

·figure to both the original cost valuation advanced and to the reproduction cost estimate as capital used up and paid for by the users of Fort Dodge.

In this division it must be remembered we are not trying to determine present value. We are trying to determine the proper per cent of the estimated life of the property which has been depreciated as though it had expired, and it is our conclusion that the correctness of computations figured on the straight-line basis is not overcome by the method advocated by the company's observed depreciation formula.

Our primary concern, as already discussed in Division II of this opinion, is with the proper determination of the present value of the remaining property life of 72.5%. In other words, we are not concerned here with the remaining life in years. While they may be greater or less than the proportion remaining of the original estimated life, only the amount now to be charged against the present value per year as annual depreciation will be of future concern in rate-making computations.

We are not by this conclusion adopting the rule that the company is only entitled to a simple return of capital invested, for we feel its right properly considered should be the right of restoration. The balance of restoration costs may be obtained by proper depreciation of present value on its extended future life. It cannot be recovered on past life or value previously paid for by the customer as operating expense. These payments should, if properly accounted for by the company, be reflected in its depreciation reserve. From the record before us we are convinced the original life estimated by the company was too low and that these facilities which have received excellent maintenance will give a much extended service period. Sufficient value still remains to provide adequate replacement under a proper revaluation.

Mr. S. Lloyd Nemeyer, a company witness, testified as to the various depreciation rates for different items used by the company in recent years, and reported annually to the Federal Power Commission. He stated: "The weighted composite percentage has been at or about 2% for all gas property for a good many years. We have had considerable concern about it being too small."

■ Where accrued depreciation is deducted from the valuation of a public utility plant in arriving at value, an allowance for future depreciation is a proper operating expense. 43 Am. Jur., Public Utilities, page 668, section 144.

Allowance for depreciation as an operating expense should be based upon present value rather than on original cost. In support of this conclusion the Texas court said: "The item of depreciation of a given piece of property appearing in current expenses for rate purposes should be closely correlated with the 'fair value' appraisal of the same piece of property from year to year, and the whole should be consistent." Railroad Commission v. Houston Natural Gas Corp. (1956), 289 S.W.2d 559, 572. Logic also would seem to compel that result. It would do the utility company no good to set its rates on the fair present value base if the base is then to be ignored and the value represented in the base annually eroded away by refusal of adequate annual depreciation expense allowance.

■ We are content to accept the 2% figure on all gas property and to apply it on the present valuation. In other words, we must continue to allow the same rate of depreciation on the *present property value* as was allowable upon the original investment. This will permit amortization on the fair present value over its remaining life.

VI. In considering proper allocations of income and expense, the trial court stated that the rate base was allocated on a basis of "who uses this property and how much." Extreme nicety in the allocation is not required, but only reasonable measures are necessary. Smith v. Illinois Bell Tel. Co., 282 U. S. 133, 51 S. Ct. 65, 75 L. Ed. 255. The principal problems which we shall very briefly discuss here relate to the multiple purpose mains, the central office at Davenport, the general gas plant, and the general plant common. The method used by the court as advocated by the city's witness Stanley was, as to demand charge, to charge the firm users with the average of (a) their computation times the average unit cost of gas (including all charges) and (b) their proportionate share of the commodity and overrun costs, plus their peak day consumption, times the demand charge (adjusted to 80% for eleven months when their peak fell below 80% of contract demand). The result was for

the test period a gas charge of $711,860 to firm customers, $1,-189,373 to the interruptibles out of a cost of $1,901,233 for the metropolitan area. Other purchased gas expense was divided in the same proportions as purchased gas expense. Distribution expense was tied to the ratios of cost of the respective facilities serving the groups in question to the total cost of the distribution plant. Central office distribution expense is brought down to the metropolitan area in the same way, and within the area it is logical to use the ratio of the costs of the respective distribution facilities to the cost of the metropolitan distribution plant. Metropolitan distributions are divided into (1) those directly serving the industries called interruptibles, (2) those serving both firm and interruptible users (multiple purpose facilities) and (3) everything else. Allocation is necessary only in dividing the costs of multiple purpose facilities consisting of two systems of high-pressure mains, one from the source of supply, the Northern's pipe line, and the other looping the area. Both firm and interruptibles are scattered along these lines. Both cost and rate of use were considered and an allocation of 44.37% of the costs was made to firm users and 55.63% to interruptibles. Collection expense was allocated on a meter basis, the interruptibles being multiplied by 30 as they are read every day, while the firm customers' meters were read only once during that period.

Commercial expense was allocated on the basis of revenue from each class, and administrative and general expense which the court called "the antithesis of direct costs" was allocated as espoused by the city's witness Stanley. Ratios were developed by finding the average for each customer class of (a) revenue, (b) cost of plant and (c) supervised operating expense (that is, operating expenses excluding taxes, depreciation, general and administrative expense, interest, and cost of gas and fuel).

The general tax and depreciation expense are allocated by similar methods. Central office general tax expenses are allocated in the ratio used for apportioning central office property. Within the district and the area general tax expense is segregated in the proportions developed for allocating property. With the exception, then, of the present depreciation expense, we believe the methods and allocations arrived at by the trial court are reasonable and fair. There is no serious objection by appellee

city to these sums, and they are adopted. As previously disclosed, we differ with the trial court on the proper method of determining the annual depreciation to be charged as a cost of operation, and conclude the company's complaint that it must be computed on its present fair value is justified. Thus we have computed depreciation at 2% on the value we have adjudged is the fair present value of the property involved, rather than on original cost.

In accordance with our determination in the previous division, the trial court's percentage of 24.19 allocated to accrued depreciation is altered and is now fixed at 27.5%.

 We also hold future depreciation must be calculated for rate-making purposes upon the adopted present fair value, and not on cost. We apply it here in the so-called interim or refund period.

 We are satisfied that the 6% rate of return which the trial court fixed does avoid confiscation. Perhaps some lesser percentage would also be held sufficient, but as no complaint seems to have been raised to the proper percentage, we do not pass on that question here. However, it is perfectly clear that a 3.93% return on the fair value is confiscatory.

In our determination of fair value of the property used by firm customers, the percentage of 27.5 was applied to the plaintiff's reproduction cost value of $2,441,267, resulting in the sum of $1,769,919 reproduction costs depreciated. It was also applied to the original cost figure advanced by the city of $1,332,366, resulting in the sum of $965,965 original cost depreciated. Giving each the weight which we judge fair and reasonable under the economic conditions recited in the record, plus our own judicial notice of rising costs, we conclude the present value of the property used and usable by the company in serving firm customers is $1,528,733. In arriving at this figure we carefully considered the evidence as to condition and type of property, and its cost of replacement, with due consideration to defendants' evidence of other construction costs in Iowa, which it claims discredits plaintiff's expert and his computations in making the replacement costs. The following, then, is our tabulation as to firm customers only, as to the test year 1954:

RECAPITULATION

Firm Customers Test Period 1954

Fair value $1,528,733 plus working capital $71,810 = $1,600,543

| | | | |
|---|---|---|---|
| Depreciation—2% current | | $30,575 | |
| Operating costs: | | | |
| Gas | $711,860 | | |
| Other gas expense | 2,128 | | |
| Distribution expense | 90,837 | | |
| Collection | 23,624 | | |
| Commercial | 3,319 | | |
| Adm. and general | 61,640 | | |
| General tax | 47,214 | 940,622 | |
| Return=$96,033—6% of $1,600,543 | | | |
| Approximate income tax liability | | | |
| $72,000 | | 168,033 | $1,139,230 |
| Revenue received | | | 1,106,209 |
| Deficiency | | | $ 33,021 |

% of return=3.93% on rate base of $1,600,543

VII. The second part of this case pertains to the court's action in determining the refund, if any, which the company must make to the firm customers of the city. By its determination of the amount of refund required, the city contends that the court acted in a legislative capacity and established the fair and reasonable rate for gas in Fort Dodge during the fourteen-month period subsequent to the issuance of the temporary injunction; that by its findings in some way the court compelled the city to adopt the rate found necessary by the court to provide a fair return for the company. It is true that a court may hold that the rates authorized by a council are adequate or inadequate, but it cannot make new rates. Peoples Gas Light & Coke Co. v. Slattery, 373 Ill. 31, 48, 25 N.E.2d 482; South Chicago Coal & Dock Co. v. Illinois Commerce Comm., 365 Ill. 218, 6 N.E.2d 152. Nevertheless, we are convinced this rule was not violated here by the court.

The trial court did not attempt to set a fair and reasonable rate and, although perhaps it may not have been improper at the conclusion of the main case to permit the council

to establish a rate in excess of the one found unconstitutional as a basis of the refund (United States v. Morgan, 307 U. S. 183, 59 S. Ct. 795, 83 L. Ed. 1211), the trial court did not err in its determination of a necessary return to avoid confiscation.

Both parties moved the court to determine the refund, if any, the city asking that the council be permitted to amend Ordinance 1026 to provide an additional income to remove the deficiency, and the company to grant it a fair return during the period of operation under the court's retained jurisdiction. The court, we think, did not attempt to determine a fair and reasonable rate, but only provided a sufficient revenue to prevent a company loss or confiscation of its property. It merely granted the company its operating expenses plus 6% upon the fair value of the property to prevent loss during that fourteen-month period.

Generally speaking, a rate which is nonconfiscatory would not be so unjust and unreasonable as would authorize setting aside the rate fixed, and yet there is a difference between a rate which is merely nonconfiscatory and one which is just and reasonable, as heretofore pointed out. Also see State Public Utilities Comm. ex rel. City of Springfield v. Springfield Gas & Elec. Co., supra, 291 Ill. 209, 125 N.E. 891. The fairness and reasonableness of the rate is for the legislative body, but the court provides here only against loss during the period of the injunction. The company does not complain of this action, only as to the computations, and we think the court was correct in retaining its jurisdiction to provide against loss to either company or consumer pending the final decision on the matter. Once it had taken jurisdiction it was proper to retain it until the damage caused by the injunctive period was repaired. The following is our tabulation as to firm customers in Fort Dodge as applied to the period of fourteen months when municipal rates were suspended by the trial court's injunction:

Firm Customer Fourteen Months Refund Period

Fair value $1,528,733 plus working capital $71,810
plus improvements $73,882 $= $1,674,425$

Revenue received $1,530,244

Revenue required to prevent confiscation:

| | | | |
|---|---|---|---|
| For depreciation | | $34,723 | |
| For rate proceedings | | 10,108 | |
| Operating costs: | | | |
| Purchased gas | $880,512 | | |
| Other gas expense | 2,578 | | |
| Distribution | 108,113 | | |
| Collection | 28,792 | | |
| Commercial | 5,353 | | |
| Adm. and general | $ 73,694 | | |
| General tax | 56,935 | 1,155,977 | |
| For return | | | |
| Net return entitled at | | | |
| 6% per yr. for 14 mos. | 117,210 | | |
| Est. corresponding inc. | | | |
| tax liability | 94,000 | 211,210 | $1,412,018 |
| Revenue excess | | | $ 118,226 |
| | | | Refund due |

VIII. Appellant-company in its Proposition IV complains of the trial court's determination that revenue should include a charge of gas to its electric department on the same basis as to other interruptibles. It contends only the actual cost of gas should be charged to that division, for otherwise it forced the company to pay a profit on gas used for its own purpose. The result, it says, was an understatement of firm customers' cost of gas of $12,849 during the refund period. Cost of gas delivered at any place of consumption, of course, is not measured solely by the cost delivered to the distribution system, and as the trial court properly pointed out must include a share of the entire operating expenses. It is not sufficient to take only the cost of the main to that plant in determining these costs. The use of all facilities of the gas distribution system must be included in this figure, and we find no error in the court's determination that the electric division, which established its rates to customers on the basis of costs of operation, be required to pay this cost of fuel supply as do other interruptible customers. This is not a case where gas comes direct to the electric division from the pipe-line supply, but is included in the distribution system of the city and metropolitan area. Cases cited by the company are

not identical, and of course none is from Iowa which would be binding on this court. Under such a determination we fail to see how either the gas or electric users could claim subsidy by the other. Each must stand its own just and reasonable operating expenses. Each has and must justify its own rate structure.

IX. It is true the trial court's original injunction in this case went too far in enjoining the city from enacting an ordinance providing an increased rate in excess of that set in Ordinance 1026, or from in any way interfering with the interim rate fixed by the company, but it later, and before the main case was heard, did modify these terms to enjoin only the enforcement of Ordinance 1026.

It is also true that if the permanent injunction issued by the trial court prevents any rate in the future at or below that set out in Ordinance 1026, it was too broad, for conditions are constantly changing and it may well be that the supplier's rates would be reduced to such an extent a lower rate would be proper. To the extent that the injunction applies regardless of changed conditions and operating expenses, it is and should be modified. No one can foresee future events, and although cost reduction seems improbable now, the court's interference with the legislative function of the city under such conditions would be erroneous.

There were other appellee city complaints such as to the inclusion of a portion of the costs of this litigation in operating expense, and the sufficiency of the evidence as to value, income tax accruals consideration in fixing operating or working capital, and others, but we would unduly extend this opinion to discuss them in detail. We have carefully considered them with the trial court's conclusions and we think the determinations of the trial court were warranted by the evidence and concur in them.

Printing costs greatly exceed that allowed by this court in appeal cases, and assessed printing costs which exceed $1.50 per page will be reduced to that amount. Costs in this court will be equally divided. Clerk assess.

Subject to the changes indicated, the judgment of the trial court is affirmed.—Modified and affirmed.

All JUSTICES concur.