Iowa-Illinois Gas and Electric Company, appellee, v. City of Iowa City (council members), appellants.

No. 50982.

(Reported in 124 N.W.2d 840)

1342

1344

NOVEMBER 12, 1963.

REHEARING DENIED FEBRUARY 11, 1964.

William F. Sueppel, William L. Meardon and Ansel Chapman, all of Iowa City, for appellants.

David M. Elderkin, of Cedar Rapids, R. H. Ivie, of Iowa City, and William B. Waterman, of Davenport, for appellee.

PETERSON, J.—Action brought by Iowa-Illinois Gas and Electric Company against Iowa City alleging that gas and electric rates under ordinances Nos. 2208 and 2209 were not sufficient to provide a fair return upon the value of the company's property devoted to serving consumers in the City and surrounding area. The company alleges the returns provided by the rates were so low as to be confiscatory.

The trial court held the electric ordinance rates only produced sufficient to pay investors 4.58 percent. It held the gas ordinance rates only produced sufficient to pay investors 4.77 percent. Both rates were held confiscatory.

Plaintiff secured a temporary injunction against charging the rates fixed by the two ordinances, and, upon filing bonds as prescribed by the court, new rates fixed by the company were put in effect March 24, 1961. The rates charged by the company under the injunction—bond period—were in excess of what the trial court considered proper earnings and it became necessary that the trial court order repayment to customers of the excess charged from March 24, 1961, to October 2, 1961.

Iowa City appealed from the trial court's decree that the rates under the two ordinances were confiscatory, and Iowa-Illinois Gas and Electric Company cross-appealed from the order of court fixing the amount of returns to customers. We refer to the City as appellant.

I. Appellant raises nine propositions with reference to which it claims the trial court erred. Our decision on most of the propositions appears with the list of alleged errors. Some of the alleged errors will be considered at length hereinafter, and our decisions thereon stated. It is alleged the trial court erred:

█ 1. In accepting jurisdiction before the company had exhausted its administrative remedy. We hold it was not necessary that further administrative proceedings be taken, nor requests made to the City council prior to commencement of this action.

█ 2. In granting an injunction to restrain the City from interfering with the collection of rates of the company's choice pending final judicial determination of the rate reduction. We hold this was a matter within the discretion of the trial court and we will not interfere with the granting of the temporary injunction.

█ 3. In failing to give the ordinance rates and methods used in the City the proper presumptive weight. There is a presumption the rates fixed by the City are correct, and the burden is on the company to show they were clearly, palpably and grossly unreasonable. This matter will be given our attention hereinafter, in connection with our consideration of the case.

█ 4. In computing the fair value of the company's electric property in the following particulars: A. In failing to accept average valuations for the test year 1960 instead of valuations at the end of the year. It might have been preferable if the trial court had used the average valuations for the test year of 1960 instead of the valuations at the end of the year. However, upon examination we find the figures are almost the same in either event so will not disturb the trial court's position. B. In allocating too high a percentage of company transmission property to the City of Iowa City. We find the trial court's

allocation as to the location of company transmission property in Iowa City is substantially correct. C. In failing to accept the reproduction cost figures for the electric generating properties presented by witness Godeke. We will consider this subject more fully hereinafter. D. In applying an accrued depreciation percentage of 30 percent to the electric property instead of the straight-line depreciation percentage of 35 percent. We hold the 30 percent depreciation percentage on the electric property as found by the trial court as a "straight-line" method is correct and we approve it. E. In giving too much weight to reproduction costs and too little weight to original cost. In Iowa-Illinois Gas & Electric Co. v. Fort Dodge, 248 Iowa 1201, 85 N.W.2d 28, we gave 30 percent weight to original cost and 70 percent weight to reproduction cost, and held this was fair, equitable and just and should be approved. In view of the analogy in the facts as between the case at bar and the Fort Dodge case we approve such percentage in this case. Mr. Stanley's percentage of 40 percent and 60 percent is not realistic.

5. In computing the net operating revenues of the company's electric operation in Iowa City during 1960 the trial court erred in the following respects: A. In failing to properly allocate operating expenses and general taxes. The allocations of operating expenses and general taxes as found by the trial court are correct. B. In failing to properly compute annual depreciation expense. We approve the trial court's decision as to annual depreciation of the electric plant, on the 3 percent of present value basis, and approve the court's computation of the depreciation amount on the basis of the approximate number of years the property will still be in use. Change in fair value creates a slight change in figures. C. In failing to properly allocate income tax expense. The trial court properly allocated such expense, both as to the electrical division of the company and the gas division, and we approve its allocation.

6. In computing the fair value of the company's gas property the trial court erred in the following particulars: A. In failing to accept the average valuations for the year 1960 in determining original cost and reproduction cost. We approve the trial court's use of the end of the year as to original cost and

reproduction cost figures. As previously indicated, the variation between average valuation and end-of-the-year valuation is so slight we will not disturb the trial court's decision. B. In applying an accrued depreciation percentage of 27½ percent to gas property instead of depreciation percentage of 30 percent. The witnesses who approached the subject realistically applied 27½ percent depreciation on the gas property. This was, in fact, a straight-line depreciation. C. In giving too much weight to reproduction cost and too little weight to original cost. We approve giving weight of 30 percent to original cost and 70 percent to reproduction cost. The trial court was not in error in this respect.

7. In computing the net operating revenues of the company's gas operation in Iowa City during 1960, the trial court erred in the following particulars: A. In failing to properly compute and allocate general taxes. The trial court's decision on allocation of general taxes was correct. B. In failing to properly compute annual depreciation expense. The instant case is like the Fort Dodge case as to gas; annual depreciation of 2 percent. Our decision in that case as to this point applies here. We use the same formula used by the trial court, as to number of years property is still to be used. We find a slight difference as compared to the court's figures. This is due largely to the difference we make as to reproduction cost, and fair value. C. In failing to properly allocate income tax expense. The allocation by the trial court of income tax expense is sustained by the evidence and we approve it.

8. It is error to arbitrarily establish the rate of return to which the company was entitled at 6 percent. Neither the trial court nor this court has authority nor should we fix any specific percentage as the required rate of return. This is a legislative function and all we can do is to say whether the rate is confiscatory.

9. The trial court erred in failing to limit this controversy to the City of Iowa City itself in determining the unreasonableness of the rates prescribed by ordinances Nos. 2208 and 2209. In its decision the trial court said in substance, It should be said at the outset that a situation exists with regard to Iowa City

which is similar to that which existed with regard to Fort Dodge in that the company's operation at Iowa City is referred to as the "Iowa City District" and covers the City of Iowa City itself and surrounding suburban areas, which in fact amount to one contiguous community.

In the case at bar we will include all contiguous territory with Iowa City in our discussion and will at all times refer to both the City and the district as "Iowa City".

II.  Iowa City is a municipal corporation operating under the Council-Manager form of government. The plaintiff, Iowa-Illinois Gas and Electric Company, is the only utility providing gas and electric service in Iowa City and does so under a 25-year franchise granted in August of 1959.

The company is an Illinois corporation engaged in the generation, transmission, distribution and sale of electricity, and the distribution and sale of natural gas. The company's Iowa territory is divided into five districts: Davenport, Iowa City, Fort Dodge, Cedar Rapids and Ottumwa.

Starting in 1955 plaintiff wrote letters to Iowa City officials requesting an increase in rates. On many occasions some representative of plaintiff appeared at council meetings and requested such increases. Between 1955 and 1961 defendant City granted the following increases as to electric rates: February 19, 1955, 3 percent; April 13, 1959, 7 percent; and February 24, 1961, 5 percent. The City granted the following increases as to gas rates: April 13, 1959, 5 percent; February 24, 1961, 5 percent.

Cities and towns of Iowa were authorized to fix the rates of public utilities holding franchises in the city or town. This is a legislative function. Cedar Rapids Gas Light Co. v. City of Cedar Rapids, 144 Iowa 426, 120 N.W. 966, 138 Am. St. Rep. 299, 48 L. R. A., N. S., 1025; Iowa-Illinois Gas & Electric Co. v. City of Fort Dodge, 248 Iowa 1201, 85 N.W.2d 28; Swan v. Indianola, 142 Iowa 731, 739, 121 N.W. 547; 62 C. J. S., Municipal Corporations, section 109, page 239.

The function of the Judicial Department of Government is restricted to deciding whether the rates established by ordinance are confiscatory. We cannot fix rates. The law was changed in Iowa in 1963 by the Sixtieth General Assembly. Any

question with reference to rates will now be submitted to and settled by the Commerce Commission acting as a utility commission. Courts might be called upon to decide whether the commission followed proper procedure and other similar questions.

III. We settled many legal questions with reference to public utilities in Iowa-Illinois Gas & Electric Co. v. Fort Dodge, supra.

Both plaintiff and defendants urge us to make some changes in our Fort Dodge decision, but we are not persuaded we should do so. We are content here to mention briefly the points there decided.

1. The ultimate goal to be determined is whether the rates fixed by ordinance provide reasonable earnings on the fair value of the plant, electric or gas. 2. The basis used in Iowa upon which rates shall be determined is the present fair value of the plant. 3. We are one of the states which fix a "fair value" to determine a reasonable and remunerative "return to the holders of utility property used in public service." 4. "A fair value rate base" is a just measuring stick for determining whether a rate is confiscatory 5. The factors establishing the present fair value are the addition of original cost, less depreciation, duly weighted, to the reproduction cost, properly depreciated, and duly weighted. 6. Whenever economic conditions justify reappraisal it should be made. 7. Utility companies are granted franchises to provide electricity, gas, water etc., and under such conditions the municipality granting the franchise has control over rates, unless confiscatory.

8. In the Fort Dodge case the fair value of the plant was fixed at reproduction cost, less depreciation, weighted to the extent of 70 percent, plus original cost, less depreciation, weighted to the extent of 30 percent. These percentages would be proper in analogous cases, but are not necessarily established for all future cases. Each case depends on its own facts. 9. Rates are controlled and kept comparatively low because the municipality has granted a franchise to the utility.

10. Accrued depreciation was defined in the Fort Dodge case (page 1238 of 248 Iowa) as: "A loss not restored by cur-

rent maintenance which is due to all the factors [involved] causing the ultimate retirement of the property. These factors embrace wear and tear, decay, and inadequacy.

"Annual depreciation is the loss which takes place in a year, and it is usually charged to the consumer. In determining reasonable rates for supplying public service it is proper to include in operating expenses, that is, in the cost of producing the service, an allowance for consumption of capital in order to maintain the integrity of the investment in the services rendered. Lindheimer v. Illinois Bell Tel. Co., 292 U. S. 151, 54 S. Ct. 658, 78 L. Ed. 1182."

11. The rates fixed by a city are assumed to be reasonable. The company has the burden to show otherwise, and in order to secure redress must show the rates to be clearly, palpably and grossly unreasonable.

12. In the Fort Dodge case the city declared the accrued depreciation figure as to gas should be fixed at 27.5 percent. The company contended it should be placed on a basis of 21 percent. We accepted the figure of 27.5 percent. This applies to both original cost and reproduction cost. As to gas segment of the Iowa City district the trial court fixed accrued depreciation on the basis of 27.5 percent. We accept the court's computation as to this matter.

IV. We discussed the question of both accrued and annual depreciation at length in the Fort Dodge case. Rates for electric service were not there involved. It was necessary for the trial court here to determine a proper rate of accrued depreciation for such service, both as to original cost and reproduction. The trial court determined such depreciation on the basis of 30 percent and we accept the court's decision. It is fully supported by defendant's witnesses. Mr. W. L. Patterson, plaintiff's witness, came up with an accrued depreciation percentage of 21 percent. He did the same in the Fort Dodge case and we rejected it.

In the Fort Dodge case we discussed the method of determining depreciation. The city there contended, and appellant contends here, that the method known as straight-line method

was fair and equitable as to all parties concerned. We approved the method in the Fort Dodge case, and approve it here. This method is the same as the one generally, but not always, used in income tax reports. The property is given an estimated life and each year an equal amount is deducted as depreciation, so at the end of its estimated life it has been fully paid for by the consumers as a part of the cost of operation of a utility.

V. It is advisable to make a brief statement of the education and experience of the more prominent witnesses. Mr. William L. Patterson, principal witness for the company, is an engineer with Black & Veatch of Kansas City, Missouri. They do engineering and appraisal work, largely in the public utility field. They have represented many cities and states and public utility companies such as this plaintiff. Mr. Patterson received a B.S. degree in civil engineering in 1927 from the University of Kansas. He has been part of the Black & Veatch firm since 1928. The last fifteen years he has spent almost full time on valuation and financial rate studies.

Mr. Godeke, witness for the City, received a B.S. degree in mechanical engineering from Texas "Tech" in 1934 and an M.S. degree in mechanical engineering from the State University of Iowa in 1935. He was an instructor in engineering in the University of Illinois for one year and assistant professor of mechanical engineering in the State University of Iowa three years. He has been with Stanley Engineering Company continuously since 1940 (except two years in military service). He was appointed chief mechanical engineer of Stanley Engineering Company in 1954 and has held that position since then.

Mr. C. M. Stanley, witness for the City, received a B.S. degree in engineering from the State University of Iowa in 1926 and an M.S. in hydraulic engineering from S. U. I. in 1930. In 1932 he went to Muscatine, Iowa, where he established Stanley Engineering Company. It practices consulting engineering in a broad field.

Dr. John Bauer, witness for the City, now resides at Chatham, New Jersey. He is an economist giving particular attention to public utilities. He is a graduate of Doane College of Crete, Nebraska, and holds a B.S. degree and a Ph.D. degree

from Yale. For many years he had an office in New York City, but in recent years has been in Chicago. He has written eleven books pertaining to utility valuation and rate control, particularly in the fields of electric power and gas.

VI. The ultimate question we are to determine is whether the company earnings are compensatory to the investors. Primarily involved in such question is the present fair value of the company's electric and gas plant.

There has been some development through the years in the method of arriving at fair value. Some years ago it was based on original cost figures trended to the test date by the use of price indices. Clark's Ferry Bridge Co. v. Public Service Comm., 291 U. S. 227, 54 S. Ct. 427, 78 L. Ed. 767; McCart v. Indianapolis Water Co., 302 U. S. 419, 58 S. Ct. 324, 82 L. Ed. 336; State v. Tri-State Telephone & Telegraph Co., 204 Minn. 516, 284 N.W. 294.

The method of arriving at fair value has now been definitely established as the sum of original cost, duly depreciated, and duly weighted, plus reproduction cost, duly depreciated and duly weighted. Central Maine Power Co. v. Public Utilities Comm. (1954), 150 Maine 257, 109 A.2d 512; McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316; Illinois Bell Telephone Co. v. Illinois Commerce Co., 414 Ill. 275, 111 N.E.2d 329.

We joined the jurisdictions approving the establishment of fair value on this basis in Iowa-Illinois Gas & Electric Co. v. Fort Dodge, supra.

An important question in establishing fair value is to arrive at a proper reproduction cost. There is no question as to the original cost figure. Conclusive evidence of this figure was presented by plaintiff and accepted by defendants.

In the Fort Dodge case we were not confronted with any controversy as to the amount of reproduction cost. The city did not offer any evidence as to this factor. The company did offer evidence, by their witness Patterson, and since that was the only testimony offered as to reproduction cost we accepted his figures.

In the case at bar the situation differs. The company again offered evidence as to reproduction cost by Mr. Patterson. The

City offered the evidence of Mr. Godeke, supported by Mr. Stanley, of reproduction cost of the plaintiff's total plant, and of the property in Iowa City. The witnesses differ substantially as to the amount of reproduction cost and we must decide the question of what amount should be fixed. Mr. Patterson testified the total amount of reproduction cost of the electric property of plaintiff is $74,851,297. Mr. Godeke testifies the total reproduction cost of the electric property is $65,136,950.

Mr. Patterson said the reproduction cost of the Iowa City segment, as to electricity, is $12,846,272; as to gas, $4,401,143. Mr. Godeke testified the reproduction cost as to the electric segment is $11,000,376; as to gas, $4,328,669.

Mr. Patterson's general definition of reproduction cost is: "The cost developed represents the cost of replacing the property as it existed on December 31, 1960, on the basis of the cost of materials, wage rates, equipment and other costs that were experienced in the area served at the time. This cost is what we refer to as reproduction cost."

Mr. Patterson's explanation of how he arrived at reproduction cost is: "The reproduction cost as of December 31, 1960, represents the estimated cost which would have been incurred if the properties were replaced as of that date. In the development of this total cost, we have considered that all of the properties would be constructed on a single large-scale construction program made up of one or more contracts, taking advantage of material quantity price discounts and giving recognition as to the local wage scales, and equipment and overhead costs existing in the Iowa City area at that time."

Mr. Godeke's general definition of reproduction cost is "the estimated cost of a new facility substantially the same as the existing facility with respect to capacity, efficiency, and durability. It is not intended to be the cost of exact duplication."

Mr. Godeke thus explains his method of arriving at proper reproduction cost: "Reproduction costs of larger structures have been determined by my own independent analysis. In making this analysis, I took into consideration the required over-all dimensions of the structure and the required type of construction. By reference to actual construction costs data

maintained in our office files, my reproduction cost estimate was based upon the size and character of the required structure and the unit cost of reproduction for such structure as shown by our records. As a final check, the reasonableness of this figure was compared with the cost of structures constructed under our supervision for other plants of similar capacity."

The two large items on which Patterson and Godeke differ are "boiler" and "turbine" costs; the latter said: "Costs of the several component company's comprising the boiler plant have been estimated by comparison with actual cost of similar equipment utilized in the construction of electric generating plants constructed under our supervision during recent years." As to his "turbine" assessments he testified: "Turbine-generator and condensing equipment costs are based upon manufacturer's current published list prices to which have been added my estimated costs of equipment, installation, foundations, and accessories."

As to at least 90 percent of the items Mr. Godeke accepts the figures submitted by Mr. Patterson. He personally examined all property and, as to all but some large items, states the appraisals are reasonable. The large items are boiler, plant equipment, turbines, etc. It is not advisable nor necessary to quote a large multitude of figures as to reproduction. As a matter of comparison we will quote Mr. Patterson's primary analysis as to the property in the Riverside generating station and Mr. Godeke's analysis as to such property. They are as follows: Mr. Patterson's appraisal:

"RIVERSIDE GENERATING STATION

| Title Steam Production Plant | Reproduction Cost |
|---|---|
| Land and Land Rights | $ 87,198 |
| Structures and Improvements | 6,589,491 |
| Boiler Plant Equipment | 16,677,888 |
| Turbo-Generator Units | 10,315,045 |
| Accessory Electric Equipment | 3,408,076 |
| Miscellaneous Power Plant Equipment | 284,217 |
| | 37,361,915 |

*General Plant*

| | |
|---|---|
| Office Furniture and Equipment | 62,862 |
| Transportation Equipment | 12,215 |
| Stores Equipment | 36,226 |
| Shop Equipment | 209,306 |
| Laboratory Equipment | 58,706 |
| Not Classified | 1,682 |
| Tools and Work Equipment | 89,112 |
| Miscellaneous Equipment | 38,336 |
| | 508,445 |

Total, Riverside Generating Station ...............a — $37,870,360"

Mr. Godeke's appraisal:

| "Description | | Reproduction Cost |
|---|---|---|
| Land and Land Rights | | $ 87,200 |
| Structures and Improvements | | |
| Substructures and Superstructures | $ 6,267,100 | |
| Misc. Buildings and Yards | 738,700 | |
| Total Account 1311 | | $ 7,005,800 |
| Boiler Plant Equipment | | |
| Steam Generating Units | 8,288,940 | |
| Coal Handling Equipment | 804,840 | |
| Ash Handling Equipment | 387,600 | |
| Oil Handling | 22,800 | |
| Gas Supply | 76,380 | |
| Instruments and Controls | 319,200 | |
| Feedwater System | 568,860 | |
| Piping | 1,926,600 | |
| Insulation | 107,180 | |
| Total Account No. 1312 | | 12,502,400 |
| Turbine Plant Equipment | | |
| Turbine Generator Units | 6,201,150 | |
| Condensing Equipment | 1,167,370 | |
| Cooling Water System | 151,630 | |
| Lubricating Oil Handling | 9,700 | |
| Instruments and Controls | 159,600 | |

| | |
|---|---:|
| Piping | 638,400 |
| Insulation | 35,350 |
| Railroad | 34,200 |

| | |
|---|---:|
| Total Account No. 1314 | 8,397,400 |
| Accessory Electrical Equipment | 3,109,500 |

Miscellaneous Plant Equipment

| | |
|---|---:|
| Compressed Air System .................$ | 112,290 |
| Fire Protection System and Misc..... | 22,800 |
| Communication Equipment | 61,560 |
| Cranes and Hoists | 94,850 |

| | |
|---|---:|
| Total Account No. 1316 | 291,500 |

| | |
|---|---:|
| Total Steam Production Plant ...............a — | $31,393,800 |

## GENERAL PLANT

| | |
|---|---:|
| Office Equipment | 62,900 |
| Transportation Equipment | 12,200 |
| Stores Equipment | 36,200 |
| Shop Equipment | 209,300 |
| Laboratory Equipment and Unclassified | 60,400 |
| Tools | 89,100 |
| Miscellaneous | 38,300 |

| | |
|---|---:|
| Total General Plant .................................$ | 508,400 |

| | |
|---|---:|
| Total Riverside Generating Station ...........................$31,902,200" | |

The total cost of reproduction as to each plant by each of said witnesses is as follows:

| | Mr. Patterson | Mr. Godeke |
|---|---:|---:|
| Riverside | $37,870,360 | $31,902,200 |
| Moline | 26,035,441 | 23,239,000 |
| Fort Dodge | 6,562,647 | 6,304,950 |
| Coralville | 4,382,849 | 3,690,800 |
| | $74,851,297 | $65,136,950 |

Mr. Patterson's final figures are based on trended cost carried forward from the date of purchase of the item to December 31, 1960. Trended cost is based on an index known as the

Handy-Whitman cost index. It is a nationally and carefully prepared index based on the changing price schedule of all material from time to time. As to many articles, and especially if the trend is not too long, it is an accurate statement of reproduction costs. As to other items, if the trend curve is long, it is inaccurate and unjust to the parties involved. We will give one example. Boiler No. 5 at the Riverside Station was very similar to a 235,000 per hour unit which Mr. Godeke purchased under contract in December of 1957 for $984,856. Trending the reproduction cost of this boiler as of January 1, 1961, would produce the figure of $1,040,000. Mr. Godeke's estimate of the reproduction cost of boiler No. 5 was $1,050,000, slightly in excess of the actual contract price of a practically identical boiler unit purchased on a competitive bid basis in 1957, trended to January 1, 1961. Mr. Patterson's reproduction cost estimate on this boiler was $1,542,666. In other words, on the basis of actual facts and as a short-term trended index as compared with a long-term trended index there is a difference of almost a half million dollars on this one item.

Another example of the inflation of Mr. Patterson's reproduction cost figures pertains to the hydro generating facility at Coralville. Mr. Godeke testified: "The Coralville hydro facility would today be considered economically unsound and it would not be reproduced under present-day construction costs. Under these conditions, the hydro facility should not be included in the evaluation at a reproduction cost in excess of its economic value. * * * According to the 1960 utility report submitted to the Federal Power Commission, the facilities were constructed in or about the year 1900 at a cost of $321,288. One of the two original hydro generating units has been removed. In his testimony Mr. Patterson has given the facility a cost reproduction of $953,821, or $3,180 per k.w. * * * This is economically unsound and obviously the facility would not be reproduced at present-day construction costs. * * * The hydro facility, therefore, is shown to have a present-day economic value of $334,000. * * * This is obviously far less than the $953,821 cost of reproduction allowed by Mr. Patterson and is I believe much more realistic."

Mr. Godeke testified: "* * * In my experience I am somewhat skeptical of trended prices, especially if they are carried too far into history. I just spot-checked a few of these for my own information. I have one instance here where a turbine generator purchased on one of our jobs in 1946, if trended to today's price, using the Handy-Whitman cost indexes, would give me a price of $958,626. * * * I would say $950,000 is a trended price, and the present-day list price for that machine is $645,000. There is a discrepancy of 40 or 45%."

Mr. Stanley testified as to cost of reproduction: "I have accepted Mr. Godeke's testimony because I have reviewed the methods that he has used; the conclusions at which he arrives; and from some 30 or more years of experience in dealing with electric generating facilities I am thoroughly convinced that the amounts which Mr. Godeke has determined as reproduction costs are ample to reproduce the facilities of the Iowa-Illinois Gas & Electric Company devoted to generation, and used and useful in that role."

Webster's Dictionary defines "reproduction" as follows: "to cause the existence of something of the same class, kind or nature as another thing."

This definition sustains the testimony of Mr. Patterson in part and Mr. Godeke in part.

As heretofore suggested Mr. Godeke accepts most of Mr. Patterson's conclusions on cost of reproduction. However, there are some important items which may not be exactly those now in place, where Godeke knows that a similarly efficient structure, or even a plant, may be reproduced for much less than Mr. Patterson's conclusions. He explains that his company, Stanley Engineering, has built such plants in recent years, and he has personal knowledge of every detail thereof.

Mr. Patterson does not deny these facts or figures of Mr. Godeke, but vigorously denies this is a proper method of arriving at true reproduction cost.

Mr. Patterson states his method of arriving at the cost of reproduction was approved by the Supreme Court. He cites Smyth v. Ames, 169 U. S. 466, 546, 18 S. Ct. 418, 434, 42 L. Ed.

819. The case is not definite in its support of his position. The first statement of the court concerning the matter is: "The basis * * * must be the fair value of the property being used by it for the convenience of the public. And in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, * * * are all matters for consideration, and are to be given such weight as may be just and right in each case." The court later uses this expression: "What it would cost to duplicate the property at the present time." However, the court does not prescribe any method of arriving at such cost.

In fact, the Smyth opinion includes a significant statement which supports the position of the City with reference to the Godeke figures: "If a railroad corporation has bonded its property for an amount that exceeds its fair value, or if its capitalization is largely fictitious, it may not impose upon the public the burden of such increased rates as may be required for the purpose of realizing profits upon such *excessive valuation* or *fictitious capitalization*." (Emphasis ours.) Also see 73 C. J. S., Public Utilities, section 18, where it is stated: "It has been held that there should be no presumption in favor of including in the rate base values which do not enter into furnishing the service paid for * * *". St. Joseph Stock Yards Co. v. United States, D. C. Mo., 11 F. Supp. 322.

There is an analogy between these statements and the fact the company is requesting earnings on the Iowa City share (6.8%) of ten million dollars of property, which is, in fact, nonexistent.

The trial court stated it accepted the reproduction costs prepared by or under the supervision of Mr. Patterson, and accepted by Doctor Bauer, defendants' witness. Doctor Bauer explained he had never had an opportunity to prepare a cost reproduction schedule for the City and, in fact, had not been asked to make such schedule. We are not adopting Doctor Bauer's position with reference to reproduction cost. His position had very little strength or meaning because he discounted Mr. Patterson's figures with reference to reproduction cost. He

said Mr. Patterson's figures in his opinion were "shot through with assumptions and imprecisions." He testified this was especially true with the reproduction cost appraisal made by Mr. Patterson of the electrical generating facilities. This is significant, because the important difference between Mr. Patterson and Mr. Godeke has reference largely to electric facilities. The difference in reproduction costs of the gas facilities is very small. The excuse Doctor Bauer made for accepting Mr. Patterson's figures to any extent was that it "cut down the areas of controversy." There is a criterion or measuring stick we are justified in using to test the reproduction figures of the two engineers. Let us envision for a moment what would be erected if a reproduction was actually made.

Let us assume the old plant has disappeared today, and a new one arises tomorrow. We are not referring to a new plant with all modern improvements installed. This would be contrary to the evidence of both engineers.

Such a reproduction built along the lines described by both engineers would not be reconstructed as Mr. Patterson testified. It would be constructed as Mr. Godeke outlines. A large percentage of the material Mr. Patterson describes is antiquated and cannot be secured after these many years. The result would be that a plant constructed as Godeke says with "similar capacity, efficiency, and durability" would be erected; not as a theory, but as a matter of actual fact.

We hereby fix the following reproduction cost, fair value and percentage of earnings, partly from the testimony of Mr. Patterson and partly from the testimony of Mr. Godeke. This pertains both as to the electric division and the gas division.

## ELECTRIC DIVISION

| | |
|---|---|
| Original cost | $ 8,146,700 |
| Less 30% depreciation | 2,444,010 |
| Balance | $ 5,702,690 |
| Weighted 30% | 1,710,807 |
| Reproduction cost | 11,000,376 |
| Less 30% accrued depreciation | 3,300,112 |

Balance ............................................................................ 7,700,264
Weighted 70% ................................................................ 5,390,184

Sum of original and reproduction cost, resulting
in fair value for rate purpose........................................$ 7,100,991

Net income .....................................................................$ 367,079

Earnings on fair value.................................................5.17%

## GAS DIVISION

Original cost ..................................................................$ 2,765,116
Less 27.5% accrued depreciation .................................. 760,407

Balance ............................................................................ 2,004,709
Weighted 30% ................................................................ 601,413
Reproduction cost ......................................................... 4,328,669
Less 27.5% accrued depreciation .................................. 1,190,384

Balance ............................................................................$ 3,138,285
Weighted 70% ................................................................ 2,196,800

Sum of original and reproduction cost, resulting
in fair value for rate purpose........................................$ 2,798,213

Net income ..................................................................... 156,075

Earnings on fair value ..................................................5.57%

For clarity we list the figures as decided by the trial court and by this court as to the Iowa City electric division and gas division.

### IOWA CITY ELECTRIC DIVISION COMPARISON TABLE

| | *Trial Court* | *Our Decision* |
|---|---|---|
| 1. Gross original cost | $8,146,700 | 1. $8,146,700 |
| 2. Less 30% acc. depreciation | 2,444,010 | 2. 2,444,010 |
| 3. Original cost less accr. depr. | $5,702,690 | 3. $5,702,690 |
| 4. Incompleted construction | (none) | 4. (none) |
| 5. Total | $5,702,690 | 5. $5,702,690 |
| 6. Gross reproduction cost | 12,846,272 | 6. 11,000,376 |
| 7. Less 30% accrued depreciation | 3,853,881 | 7. 3,300,112 |

| | | | |
|---|---|---|---|
| 8. Reproduction cost less accr. depr. | 8,992,391 | 8. | 7,700,264 |
| 9. Incompleted construction | (none) | 9. | (none) |
| 10. Total | $8,992,391 | 10. | $7,700,264 |

*Fair Value*

| | | | |
|---|---|---|---|
| 11. Original cost weighted 30% of line 5 | 1,710,807 | 11. | 1,710,807 |
| 12. Reproduction cost weighted 70% of line 10 | 6,294,673 | 12. | 5,390,184 |
| 13. Total | 8,005,480 | 13. | 7,100,991 |
| 14. Working capital | (none) | 14. | (none) |
| 15. Total fair value | 8,005,480 | 15. | 7,100,991 |

*Fair Value & Revenues*

| | | | |
|---|---|---|---|
| 1. Fair value rate base | 8,005,480 | 1. | 7,100,991 |
| 2. Operating revenues | 2,085,916 | 2. | 2,085,916 |

*Operating Revenue Deductions*

| | | | |
|---|---|---|---|
| 3. Operating expenses | 929,694 | 3. | 929,694 |
| 4. Annual depreciation | 340,233 | 4. | 340,233 |
| 5. General Taxes | 247,674 | 5. | 247,674 |
| 6. Fed. & St. Inc. Taxes | 234,639 | 6. | 234,639 |
| 7. Total operating deductions | 1,752,240 | 7. | 1,716,378 |
| 8. Net operating revenue | 333,676 | 8. | 333,676 |
| 9. Rate of return, line 8 divided by line 1, *4.17 percent* | | 9. | |
| 10. Adjustments for known changes | 33,403 | 10. | 33,403 |
| 11. Adjusted net operating revenue | 367,079 | 11. | 367,079 |
| 12. Adjusted rate of return, 4.58 percent | | 12. | 5.17% |

IOWA CITY GAS DIVISION COMPARISON TABLE

| | *Trial Court* | | *Our Decision* |
|---|---|---|---|
| 1. Original cost | $2,765,116 | 1. | $2,765,116 |
| 2. Less 27½% accrued depr. | 761,407 | 2. | 760,407 |
| 3. Original cost less accr. depr. | $2,003,709 | 3. | $2,004,709 |
| 4. Incompleted construction | (none) | 4. | (none) |
| 5. Total | 2,003,709 | 5. | 2,004,709 |

|  | | |
|---|---|---|
| 6. Reproduction cost | 4,404,143 | 6. 4,328,669 |
| 7. Less 27½% accrued depr. | 1,211,130 | 7. 1,190,384 |
| 8. Reproduction cost less accrued depreciation | 3,193,004 | 8. 3,138,285 |
| 9. Incompleted construction | (none) | 9. (none) |
| 10. Total | 3,193,004 | 10. 3,138,285 |

*Fair Value*

|  | | |
|---|---|---|
| 11. Original cost weighted 30% of line 5 | 601,113 | 11. 601,413 |
| 12. Reproduction cost weighted 70% of line 10 | $2,235,103 | 12. $2,196,800 |
| 13. Total | $2,836,216 | 13. $2,798,213 |
| 14. Working capital | (none) | 14. (none) |
| 15. Total fair value | 2,836,216 | 15. 2,798,213 |
| 1. Fair value rate base | 2,836,216 | 1. 2,798,213 |
| 2. Operating revenues | 1,709,598 | 2. 1,709,598 |

Operating deductions:

|  | | |
|---|---|---|
| 3. Operating expenses | 1,290,040 | 3. 1,290,040 |
| 4. Annual depreciation | 97,849 | 4. 77,189 |
| 5. General taxes | 114,654 | 5. 114,654 |
| 6. Federal & St. Inc. Tax | 88,089 | 6. 88,069 |
| 7. Total operating deductions | 1,590,632 | 7. 1,569,952 |
| 8. Net operating revenue | 118,966 | 8. 139,646 |
| 9. Rate of return, line 8 divided by line 1....*4.19 percent* | | 9. |
| 10. Adjustment for known changes....$ | 16,429 | 10. $ 16,429 |
| 11. Adjusted net operating revenue.... | 135,395 | 11. 156,075 |
| 12. Adjusted rate of return....*4.77 percent* | | 12. 5.57% |

It follows that we think plaintiff has failed to show by the requisite degree of proof that the rates fixed by the city are confiscatory.

VII. Both parties have presented witnesses who testified concerning bond valuations and finances. Plaintiff presented the

evidence of Mr. Edward Hopkinson, Jr., an investment banker associated with Drexel & Company of Philadelphia. He became a partner in the company April 1, 1940. He is also a member of the New York, Philadelphia and American stock exchanges.

He testified in general to the fluctuation in the value of stocks from time to time. His evidence was not specifically directed toward utility stocks. His conclusion was that common stock in a corporation such as plaintiff should produce at least 7 percent interest. As a basis for his conclusion he selected twenty industrial stocks. They were all stocks of independent companies. There is no public restriction on the earnings of such stock companies, and the comparison is not a happy one.

Defendants offered the evidence of Dr. Charles E. Marberry, an associate professor of finance in the Business Administration at the State University of Iowa. He received a Ph.D. degree in 1952 from the University of Illinois. He is teaching courses in business finance, investments and securities analysis at the University of Iowa. Doctor Marberry discussed the finances of utility stocks at length. He gave the history through recent years of the rate of return on such stocks. In the light of such history he analyzed the statistical cost of capital for a utility such as plaintiff. He prepared an exhibit which shows the statistical cost of capital for plaintiff is 5.10 percent. This includes the recent issue of fifteen million dollars of first mortgage bonds by plaintiff which sold at four and seven-eighths percent.

He estimated the future cost of capital for plaintiff-company either in common stock or first mortgage bonds would range from 5.01 to 5.33 percent. Doctor Marberry was asked these questions and gave these answers:

"Q. On the basis of your analysis, what should be the allowed rate of return for this company? A. The rate of return should be 5.25% in the Iowa City market. If the market were stationary, the rate of return should be no more than 5.1%. However, the market can be expected to expand and new capital must be attracted. The market is a low risk market. * * *

"Q. Would you characterize the rate of return of 5.25% as

being restrictive? A. No. The rate of return of 5.25% is a fair return, on the liberal side."

VIII. Appellee cross-appealed from the order fixing the amount of overpaid rates which should be returned to the consumers. Our decision being more favorable to the City, the cross-appeal is affirmed with directions.

We do not have in the record figures as to what amount shall now be repaid to the consumers. We can announce the principle on which such figures will be based. The actual figures will be computed on the basis of such principle by the trial court and will be filed in the case by such trial court in a supplemental opinion. The questions are only mathematical and cannot involve any fundamental differences. The principle involved is that plaintiff shall return to such consumers the difference in rates collected by plaintiff and the rates established by ordinances of Iowa City, Nos. 2208 and 2209 from March 24, 1961, to whatever date such ordinance rates are placed in effect by plaintiff after the conclusion of this action.

Recently appellee filed a motion to reconsider motion to strike appellants' reply brief and argument. The motion to reconsider is overruled.

This case is Reversed as to defendants' appeal, and Affirmed with directions as to plaintiff's cross-appeal.

All JUSTICES concur except THOMPSON and LARSON, JJ., who take no part.